# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

CALVIN LAMONT PARKER,
Defendant and Appellant.

S113962

San Diego County Superior Court
SCD154640

May 19, 2022

Justice Groban authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Liu, Kruger, Jenkins, and Petrou* concurred.

---

\*      Associate Justice of the Court of Appeal, First Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. PARKER

S113962

Opinion of the Court by Groban, J.

This automatic appeal follows from defendant Calvin Lamont Parker's 2002 conviction and death sentence for the murder of Patricia Gallego. Defendant was found guilty of first degree murder in violation of Penal Code[1] section 187, subdivision (a), and the jury also found true the lying-in-wait special circumstance (§ 190.2, subd. (a)(15)), as well as the special circumstance allegations that defendant intentionally killed Gallego for financial gain (§ 190.2, subd. (a)(1)), while engaged in the commission or attempted commission of rape (§ 190.2, subd. (a)(17)). After a penalty trial, the jury returned a verdict of death. We affirm the judgment.

**FACTUAL BACKGROUND**

**A. Guilt Phase**

*1. Prosecution's Evidence*

Defendant and Gallego were roommates who met while she was dating his former roommate, Charles Ijames, in 1997. Gallego was a Brazilian citizen and had moved to the United States in 1996. In 1998, after Gallego had dated Ijames for some time, defendant told Ijames that Gallego had offered to pay him $5,000 if he would marry her. Ijames understood the offer to be

---

[1] All further unspecified statutory references are to the Penal Code.

purely transactional, not romantic. Ijames got the impression defendant was uneasy about Gallego's request and that he would turn her down.

Gallego and Ijames broke up in late 1998, and Gallego went back to Brazil. She returned to the United States in late 1999. Ijames and defendant stopped living together in November 1999, and about six months after that, defendant told his friend Leilani Kaloha that he was moving in with Gallego. Defendant told Kaloha that he had known Gallego previously, that he planned to marry her in exchange for money, and that they were moving in to make their marriage appear plausible. A month or two after defendant told Kaloha he planned to marry Gallego, Kaloha asked defendant if that was still the case, and defendant said it was not. Marilyn Powell, defendant's ex-girlfriend, learned defendant and Gallego no longer planned to marry some months after moving in together, and Powell thought defendant was upset about the change in plans.

Gallego held two jobs while living with defendant. She was a server at Yakimono restaurant and a supervisor at Café Chloe. Several days before her disappearance, Gallego told Eudes De Crecy, the owner of Café Chloe, that she wanted to change her life and move out of the apartment she shared with defendant. De Crecy observed that Gallego was stressed, tired, and unhappy in the days immediately preceding her disappearance.

Gallego was last seen after her shift at Café Chloe on August 10, 2000; she did not return for her next scheduled shift on Monday, August 14 or any time before that shift. Several days after she was last seen, a man who identified himself as Gallego's roommate called both restaurants to tell them Gallego

returned to Brazil temporarily and asked them not to terminate Gallego's employment.

In late July 2000, defendant wrote a letter to his supervisor at work requesting time off in August. He explained that his mother had terminal cancer, and despite the store's understaffing, his request for nearly a week of leave, from August 7–12, was granted. In fact, pursuant to the parties' stipulation, defendant's foster mother, Eva Nunn, did not have cancer or any other terminal illness, and he had not spoken with her in over three years.

In the months leading up to Gallego's disappearance, defendant began calling Wells Fargo Bank, where Gallego did her banking, to check on the status of her accounts. He called on June 20 and 28, 2000, and on July 18, 2000.

On August 12, 2000, defendant rented a U-Haul truck, which he parked overnight outside of his apartment. Later that day, defendant bought a "45-gallon roughneck trash can with wheels" and a hand drill at a Home Depot. He then went to a Wells Fargo Bank branch, where he cashed a $300 check written from Gallego's account to him.

The next morning, defendant purchased bolt cutters from a Home Depot store, where he also rented a Rug Doctor carpet cleaning machine. That evening, around 5:00 p.m., a man was seen parking a U-Haul next to dumpsters located outside a PetSmart. The U-Haul held garbage bags and a Rug Doctor carpet cleaning machine; the man was seen throwing two large garbage bags into a dumpster, flicking an object — later revealed to be a human fingertip — into the brush nearby, and driving away. That night, Josh Dubois, defendant's upstairs neighbor, heard a great deal of noise coming from defendant's

apartment between 3:00 a.m. and 4:00 a.m. He testified he heard duct tape being torn off of a roll numerous times, as well as car doors opening and closing outside of the apartment's windows.

Around 11:30 a.m. on August 14, 2000, defendant visited a Wells Fargo Bank branch and attempted to cash a $350 check written from Gallego's account to him. The bank's computers were unable to process the check, and defendant left the bank without having completed the transaction.

That evening, defendant called Anna Ching, Yakimono's owner, to tell her Gallego's mother had had an accident in Brazil, and Gallego flew there temporarily. Defendant conveyed that Gallego needed her job and asked that Ching not terminate her employment. The next day defendant telephoned Loic Vacher, a manager at Café Chloe, and told him a similar story: that Gallego went to Brazil "because one of her parents was in the hospital" and that she planned to return and "didn't quit or something like that."

Early in the morning on August 14, 2000, Steve Gomez, a maintenance worker for a PetSmart shopping center, was looking through the dumpsters behind the PetSmart store, a practice he engaged in routinely to search for discarded items he could take home to his pet. That morning, as he looked through some discarded trash bags, he saw several fingertips. Gomez contacted his supervisor, Cauhtemoc Topete ("Temo"), who called law enforcement. Temo noted the fingers appeared to be burned, and Gomez believed the fingertips were feminine.

San Diego Police Officer Phillip Franchina responded to the PetSmart parking lot and saw "severed fingers" among the trash in the dumpsters. James Francis Hergenroeather, a

homicide detective with the San Diego Police Department, responded to the PetSmart scene, where he removed and cataloged items found in and around the dumpsters.  The items found included:   eight fingertips found in and around the dumpsters;[2] cigarettes and lighters; "two yellow rubber gloves with red stains"; a razor blade; an empty bottle of "Tile Action" cleaner; wet paper towels; duct tape packaging, tape, and bolt cutters with a Home Depot sticker attached; and a separate bag containing many items, among them a banana peel, a pair of jeans, a hand drill, a wet washcloth, and empty perfume bottles labeled "Bath and Body Works Splash Freesia" and "Dazzling Gold Estee Lauder."

Within the bag containing the banana peel, Detective Hergenroeather also found two pieces of paper with writing on them.  The first paper read, "Please do not disturb.  Sleeping.  Thanx [sic]."  The second was a handwritten "to-do" list, which included the following items and notations:   "2-4am; M-Th; shaver cord; dish wash gloves; Adidas jacket; knit cap inside-out; long black nylon (Nike sweats); digi cam (scanner); cucumber; get info → software for moving, altering, or enlarging photos; burn palms + face thoroughly; (small hand truck & drawer for extraction from apt.); 2 S.A.S.E. letters re: 11 day hiatus to visit w/ grieveng [sic] relatives; need these checks; 5-day hiatus for me; Su → Th & slave screams; Ads in Reader + Internet Baby!!; on Aug. 2nd/10th/ & 15th; ensure 7,200.00 avail…; close all windows + kitchen; lock doors; on her stomach;

---

[2]   Detective Sergeant William Holmes returned to the PetSmart parking lot the day after Detective Hergenroeather's search to investigate an allegation that a witness saw an item being thrown or flicked away near the dumpsters.  He found a human thumb in the planters near the dumpsters.

(shave + plug a virgin pussy & clenching ass cheeks pound 'em); (rub your nuts . . . lubed-up tits & lubed-up asshole!!!); (your nuts . . .); (30 & afraid to take a dick — what a fuckin' joke)." The list also had a drawing on it showing two people lying on top of each other with the caption, "um you got daddy all big n wet, now let's spank that tight lil asshole."

On the morning of August 13, 2000, Dale Kaler noticed a mattress left in the roadway along the fence line of his neighbor, Scott Carroll's, house. Their daughters, who had been running a lemonade stand that day, noticed the mattress was bloodstained. Kaler and Carroll notified the San Diego Police Department, and officers responded.

On the evening of August 14, 2000, Debra Desrosiers was walking with a friend in her Carlsbad neighborhood when they noticed a duct-tape-wrapped trash can in a ditch off the road. The trash can was out of place, particularly in the well-manicured subdivision, so they decided to kick the trash can and noted it was heavy. Desrosiers's walking partner lifted the trash can's lid, and both women saw what appeared to be flesh and dark hair in the can and immediately called the police. A body was found in the trash can, ultimately identified as Gallego.

On August 15, 2000, defendant telephonically transferred the $4,670.02 balance of Gallego's savings account to her checking account. Later that day, he was arrested at the apartment he shared with Gallego.

Detectives Hergenroeather, Holmes, and Washington searched the home. The apartment looked clean, the windows were closed, and Gallego's bedroom and bathroom appeared to have been cleaned. In Gallego's bedroom, a bed frame and

mattress were propped against a wall, and there was a red stain on the carpet.

A number of items were found in the apartment matching what was listed on the note in the dumpster, including: a shaver with its cord (found in defendant's bathroom under the sink); dishwashing gloves; an Adidas jacket (found in defendant's closet); a knit cap (found on defendant's bed); and Nike pants (found in defendant's closet). A search of Gallego's car and the U-Haul revealed items listed on the handwritten note found in the dumpster or similar to items located in the dumpster, including a dust mask and bottle of Chanel perfume and a hand cart. A Nash brand scarf was found in the living room closet.

Defendant's apartment contained a number of cleaning supplies, including a towel and a wet washcloth found in a laundry basket in the living room, black garbage bags with red pull tabs like those found in the dumpster, several used mops, and assorted cleaning products found in the kitchen and beneath the sink in defendant's bathroom.

Gallego's passport photos and other identification documents were found in the living room in a manila envelope on the living room floor with the letters "CAL" and "P.R.G." written on it. Check No. 201 from Gallego's account, made payable to "Cal," was found in the kitchen trash. Gallego's car keys were located in the dining room, along with a notebook and a note with instructions on how to drive a manual car.

Several receipts[3] and credit card applications[4] were found on the kitchen counter, along with a credit card in defendant's name, defendant's driver's license, $194.30, and a sheet of paper listing names, phone numbers, social security numbers, and a driver's license number.  The check defendant tried to cash at the Wells Fargo in Mission Valley, No. 202, was also found on the kitchen counter.  More papers were located in defendant's bedroom, including:  a Ralphs receipt for garbage bags and food dated August 13, 2000 at 11:41 p.m.; an envelope with the words "Patricia G." on it, along with numbers and place names; a note with no intended recipient that said, "I am sorry that I'm not able to finish my shifts"; two shorter notes; and a letter.[5]

---

[3]    The receipts included:  an August 13, 2000 receipt for a Rug Doctor rental; an August 14, 2000 receipt for the return of the U-Haul truck; a receipt from a Sav-On in Carlsbad dated August 14, 2000 at 11:38 p.m.; and a receipt from a Togo's in Carlsbad dated August 15, 2000 at 11:40 a.m.

[4]    The credit card applications included:  a J.C. Penney credit card application made under the name "Pat R. Gallego"; a Nordstrom FSB credit card application made under the name of "Pat Ramos Gallego"; a Mervyn's credit card application made under the name of "Pat R. Gallego"; a Robinsons-May credit card application made under the name of "Pat R. Gallego"; and a Wells Fargo credit card application made under the name "Patricia Ramos Gallego."

[5]    The letter stated, in full:  "I underline 'true self,' because if that's your thinking.  [¶] I didn't feel much like talking last night, because all my life long, I've been lousy with any . . . of verbal confrontation.  So much so that you'd be left with the impression that I'm the fuckin' foreigner.  [¶] Plus, I was pissed-off about your agenda — just like a God damn Nazi!!  Are you the only men you'll show your true self to, have to fit some fuckin' media mind controlling criteria of T.V. actor looks or

Hundreds of pornographic images were recovered, including hand-altered images depicting body parts from one image pasted to another. Several of these images were collaged photographs of Gallego's face combined with body parts of models from pornographic magazines. Pornographic videotapes, pages from pornographic magazines, and hundreds of altered images comprised the concededly large collection, which the trial court described as "six to ten cubic feet" of materials.

San Diego Police Department Criminalist Shawn Montpetit saw drops of blood on the carpet in Gallego's bedroom and applied Luminol to parts of her bedroom and bathroom. Luminol testing also revealed blood present on a bed frame that was leaning against a wall. Samples from the carpet in Gallego's bedroom that had fluoresced following Luminol application were DNA tested, and the blood in the carpet was consistent with Gallego's. Blood was seen at the threshold of Gallego's bathroom door along the metal strip and along the door frame. Dirt patterns suggested a rug had been removed from Gallego's bathroom floor. Swabs were taken from the fluoresced areas of Gallego's bathroom floor underneath the towel rack and near the shower door, but no blood could be

_____

money or blond hair and blue eyes. You're such a fucking puppeted piece of shit at a whimsical society's mercy. [¶] With all that you've ever said I do you do your best and succeed at making me feel completely insignificant — about half the time — while in the early weeks of our cohabitation, I just wanted to confront you. I call it feeling and acting like a human being, by yielding, caring, respect, attention and notes and flowers to perpetuate said intentions. [¶] Your brain can only hope to aspire to be my liquid excrement!!"

confirmed from those tests.  Montpetit testified that cleaning the bathroom could have removed all of the blood.

Deputy Medical Examiner Christopher I. Swalwell performed an autopsy on Gallego's body on August 15, 2000. The body arrived in a plastic trash can, wrapped in plastic, and without clothing save a Nash brand scarf looped and tied loosely around Gallego's head in a double knot.  Her body emitted both a foul odor and a sweet one, the latter smelling of Bath and Body Works Freesia Body Splash or Estee Lauder Dazzling Gold perfume, bottles of which were found in the PetSmart dumpster and believed to have been used to mask the smell of decomposition.

A number of external changes and injuries were visible including:  pre- and postmortem discoloration due to decomposition; a shaved pubic area with no regrowth of hair; missing fingers, eight of which and a thumb were later matched to the body; blackened and wrinkled skin around her hands suggesting postmortem burning; bruising and marks on her arms, wrists, head, neck, back and ankle; and a postmortem fracture of her thyroid cartilage, an injury common in asphyxia by hanging or strangulation.

Swalwell did not definitively determine the time of Gallego's death, but estimated it occurred two or three days before his examination.  Gallego suffered blunt force trauma to her head resulting in a skull fracture.  Assuming she was not already unconscious, Gallego's contact with the object would likely have caused her to lose consciousness.  Her head injury, caused by a sharp object like the corner of a desk or a rock, would not have been fatal and likely occurred premortem because there was bleeding.  Gallego also suffered a cut — or sharp force

trauma — to her neck, severing her internal jugular vein. Gallego's neck injury occurred premortem, and blood loss resulting from her injuries was the cause of her death. Gallego's body contained no blood, and she had no blood on her body, suggesting she lost blood somewhere other than the trash can she was found in. Swalwell testified that submerging a wound in water tends to keep it moist and prevents clotting, allowing blood to flow. He testified that if Gallego was submerged in a bathtub or if water was run over her neck injury, that could have played a role in her total blood loss. Gallego's death would not have been immediate; it would have occurred between one minute and one hour after suffering her injury.

Sergeant Holmes viewed postmortem photographs of Gallego's wrists and back and believed based on marks he observed that handcuffs may have been used during the homicide. Detective Hergenroeather likewise noted Gallego's left wrist was bruised or marked in a pattern similar to someone who had been handcuffed for too long.[6] Holmes sought the assistance of Dr. Norman Sperber, a forensic dentist and expert

---

[6] Defendant had been known to lock his bicycle using handcuffs; he did so during the period he lived with Ijames. Powell also testified she was aware of defendant using heavy metallic silver handcuffs as a bike lock. Defendant rode his bicycle to Powell's house several times a week during their relationship, and he would either lock it outside with the handcuffs or bring the bicycle inside and keep the handcuffs in his backpack. Powell described the handcuffs as similar to the type police used, with a metal chain linking the two bracelet portions of the cuffs. Following Gallego's death, the property from the shared apartment was moved to a storage facility, including a bike that had been stored in a common area, photographed both with and without a lock.

in tool mark identification — that is, marks left by any object on a soft or hard material, which includes marks left by teeth. Sperber examined Gallego's body in the medical examiner's office to assess whether a mark on her lower back could have resulted from having had her hands cuffed behind her back. Sperber compared the marks against several varieties of handcuffs kept in the police department's property room. To do this, Sperber turned Gallego's body facedown, positioned her hands behind her back, and placed handcuffs on her wrists — observing that the metal chain connecting the two rings of the handcuffs was directly over the marked area on her back. Sperber also noted Gallego's right wrist bore a faint mark consistent with having worn handcuffs.

Gallego's body was examined for physical evidence of sexual assault, and no injuries were seen. Montpetit found a mixture of sperm and epithelial cells on vaginal swabs taken from Gallego, of which defendant and Gallego were "possible contributors." The probability that someone other than defendant and Gallego contributed to the DNA was "1 in 1200 for the Caucasian population, 1 in 2400 for the African-American population, and 1 in 1800 for the Hispanic population."

Additional DNA evidence was collected from the bolt cutters, which matched Gallego's. The scarf found tied on Gallego's body was tested for the presence of saliva and blood, with inclusive results for the former and positive results for the latter. The mattress was tested for the presence of blood and sperm, and Montpetit found DNA from blood consistent with Gallego's and DNA from sperm cells consistent with defendant's. Gallego's DNA was also found in bloodstained areas of the carpet in Gallego's bedroom.

Montpetit tested the rubber gloves with red stains, which were negative for blood. A sperm cell was found on the banana peel that had been discarded in the same trash bag as the to-do list found in the PetSmart dumpster, but Montpetit was unable to test it given the sample size. The U-Haul truck contained several bloodstains and droplets, and testing of those suggested Gallego was the most likely source.

Following his arrest, defendant met Edward Lee — who had been arrested on drug-related charges — and made several statements to him. Defendant told Lee he had been arrested for murder, having initially planned to marry a woman from Brazil for $2,000 but later deciding "to do another thing" because he learned she had approximately $15,000 in the bank. Lee understood defendant had been roommates with the woman he planned to marry and that she intended to put money into a joint bank account to make the marriage seem legitimate.

Defendant told Lee that after he killed the woman, he cut off her fingers with bolt cutters, and it was more difficult to accomplish that task than he had anticipated. Defendant "said he had to just kind of jerk it around to get it to pop. The skin, you know. He was cutting the knuckles." Lee testified defendant believed he would not be caught since the woman he killed was from a different country. Lee testified that defendant told him he drove a truck to Carlsbad to dispose of the body and that he was startled by a light while in the process of disposal, so he drove away. Defendant told Lee that he bagged up Gallego's fingers and threw away several bags — including the one with her fingers — in a dumpster while an older woman watched him doing so. Defendant allegedly told Lee he drained the woman's blood in a bathtub before disposing of her body.

13

David Oleksow, an expert in handwriting, compared some documents against defendant's handwriting exemplars. Oleksow concluded defendant was responsible for creating the handwritten portions of six credit card applications in Gallego's name and a portion of Rug Doctor receipt.

### 2. *Defense Evidence*

Defendant presented evidence from Gallego's friends and former roommates, their neighbors, law enforcement officials, a forensic pathologist, an acoustics expert, and the jailhouse informant's mother.

Gallego's former roommate, Stephanie Ortiz, testified that Gallego discussed marrying a United States citizen to gain citizenship. Gallego told her former roommate, Kristina Stepanof, that she was living with a friend to make it appear they were in love.

San Diego Police Officer James Tomsovic testified that De Crecy, the owner of Café Chloe, said Gallego seemed "normal" and "upbeat" the last time he saw her and had relayed her plans to get married on August 27, 2000. Defendant presented testimony from Café Chloe customer and immigration attorney, Giacomo Behar, who recalled speaking to several of the Brazilian servers at the café and leaving his business card should any of them need his assistance.

Gallego and defendant's next door neighbor, Laura Balza, heard an argument the week of August 6 that she thought was coming from the apartment above her.

An acoustics expert, Jack Goldberg, testified that the sound of a woman screaming in defendant's apartment would be loud enough to wake someone in the adjacent apartment and would likely wake someone in the apartment above, particularly

if their windows were open. No evidence of a scream being heard was presented. Goldberg measured the decibel level of ripping duct tape, determined it to be much lower than a scream, and concluded that if a nearby apartment resident was able to hear duct tape ripping, that resident would also likely be able to hear a scream.

Powell testified that Gallego and her then boyfriend, Ijames, had fights that involved cursing and raised voices.

Dr. William Brady, a forensic pathologist, testified Gallego died as a result of the deep cut to her neck and resultant bleeding. Brady believed Gallego's head injury was not necessarily fatal. Brady concluded Gallego was not gagged, was not handcuffed while alive, and suffered no forcible sexual contact.

Annie Lee, Edward Lee's mother, provided impeachment evidence against Lee. She testified Lee threatened to kill her and her tenant. Although she was not afraid he would harm her, she sought a restraining order against him because he was addicted to drugs, and she wanted him to seek treatment.

## B. Penalty Phase

### 1. *Victim Impact Evidence*

Gallego's mother, father, and former roommate testified. Gallego's mother, Terezinha Ramos da Silva, testified Gallego was a happy and hard-working young woman. Gallego's mother last spoke with her daughter a week or two prior to her death. She learned of her daughter's death after Gallego's father received phone calls he did not understand, and da Silva called her daughter's number and was told by the woman who answered that her daughter was dead. Gallego's mother testified that Gallego was "everything to" her. Although da

15

Silva learned her daughter was dead from the woman who answered Gallego's phone, she did not learn the circumstances of her death until later; she testified Gallego died twice — once when da Silva heard about her death and again in the courtroom while testifying.

Gallego's father, Rubens Gallego, also testified that Gallego was "an enchanting girl. She was always happy. She would just play. And she pleased everybody." Her brothers were distraught upon hearing the news of her death. Rubens had planned to visit his daughter to celebrate her upcoming birthday. He learned the news of his daughter's death from his family and then the consulate, and attending the trial and learning the whole story is "much wors[e] than [he] had thought."

Gallego's former roommate, Stepanof, also testified for the prosecution, describing how she and Gallego became friendly after Gallego temporarily moved in with her. Stepanof described Gallego as warm, friendly, and energetic. Gallego introduced Stepanof to some of her friends from Brazil, and Gallego attended church services with Stepanof. Stepanof learned of Gallego's murder from Detective Keyser and described its effect on her as "hard."

### 2. *Defense Evidence*

Defendant's mother, father, sister, aunt, foster mother, foster brother, and social worker testified about his upbringing. A pediatrician testified about the effects of child abuse and neglect.

Defendant's mother, Brenda Graves, appeared in court accompanied by a social worker. She last saw defendant at one of his foster homes and recalled that he was born in July, but

she did not know which day.  Defendant and his sister, J.G., were removed from her care at some point; both were initially placed with her mother and then in foster homes.  She visited them in both placements.  Graves was incarcerated in a state hospital and treated for heroin and alcohol addiction; she denied being physically violent toward her children.  Ollie Lee, Graves's sister, testified defendant's father was physically abusive to Graves, and Graves was physically abusive with defendant.

Defendant's father, Lawrence Parker, testified he did not recall what day in July defendant was born.  He described injuries defendant suffered as a child.  When defendant was one year old, he swallowed some of Graves's pills and was taken to the hospital where his stomach was pumped; he recuperated after a few days.  One year later, Lawrence observed Graves running angrily up the stairs, heard furniture moving and defendant screaming, and saw a large cut on defendant's head that bled profusely.  Lawrence called the police and defendant was treated and removed from the home.  After separating from Graves, Lawrence saw defendant just twice more during his childhood and once during his adulthood, each time for a period of just a few hours.

Defendant was made a ward of the court.  He and J.G. were placed with their grandmother and aunt.  Living conditions at the home were found to be "deplorable" due to his grandmother's  ill health and numerous other children living in the home.  Katherine Graves, defendant's grandmother, also cared for Ollie, two of her brothers, defendant, J.G., and 11 of their cousins.  J.G. testified that there was not always enough to eat while living there.

While defendant was living with Katherine and Ollie, when he was about six years old, he contracted gonorrhea. When doctors asked defendant who was "messing with him," he told Ollie that his uncle's girlfriend had done so, and his uncle responded to that information with pride. J.G. also suffered physical and sexual abuse by her cousins and uncles while living with Katherine and Ollie.

When defendant and J.G. were nine and seven, respectively, they were placed with foster parents Eva Nunn and her husband. They arrived at Nunn's home with matted hair and trash bags filled with adult-sized clothing that smelled of urine. J.G. testified that the Nunns treated her well, and she came to appreciate as an adult how much effort they expended caring for her. Nunn described defendant as a quiet child who liked to draw. Nunn also cared for an unrelated foster child, eight-year-old John Breen. Breen testified that while he and defendant lived with the Nunns, Breen mentally and physically abused defendant for years, once slamming a ceramic piggy bank against defendant's head, and sometimes using a butcher knife to threaten and scare him. J.G. testified that Breen was a "horrible" brother and "bad kid."

Graves wrote letters to defendant and J.G. while they lived at the Nunn's home, and she visited sometimes. Nunn described Graves's demeanor as childlike during those visits; Graves mumbled to herself, spoke like a child, and talked about her plans to marry Michael Jackson and other musicians.

Defendant also presented testimony from Dr. Marilyn Kaufhold, a pediatrician expert in child abuse and neglect. Kaufhold testified that a child who suffers trauma is often "hyperaroused." If such a child also suffers neglect, the person

experiences difficulty forming relationships in adulthood. Kaufhold explained that a parent with a mental illness may not be able to provide a safe environment for a child because the parent may be unable to discern what would be dangerous for the child and because that parent may be unable to provide a structured and predictable home.

Kaufhold reviewed defendant's medical records, noting that when defendant was 12 months old, Graves hit him to stop him from crying, causing his lip to split and bleed. In March 1971, defendant ingested 118 prenatal iron tablets and was admitted to the hospital, where he remained in critical condition for five days. In July 1971, in an effort to stop defendant from crying, Graves hit his head into a dresser causing a two-inch laceration. While he was recuperating from his head injury, defendant was again admitted to the hospital with abdominal pain, and surgery revealed an abdominal abscess and intestinal obstruction resulting from corrosion caused by his earlier ingestion of iron pills. Kaufhold characterized these incidents as abusive and neglectful. Defendant had a history of bed-wetting, which persisted throughout his childhood and adolescence.

### 3. *Rebuttal Evidence*

Defendant's ex-girlfriend, Brenda Chamberlain, provided rebuttal evidence. She testified that she and defendant met through a mutual friend, and when he returned from a six-month long deployment with the Navy, the two began dating. They moved in together three months later, and for three years enjoyed a normal relationship. In their third year of dating, they broke up a few times; Chamberlain describes the final year of their relationship as "on and off quite a bit." Chamberlain loved

defendant and believed he loved her, although once they broke up, she did not maintain contact.

When they were dating, Chamberlain and defendant would engage in various social activities and would take photographs of one another while doing so. Chamberlain was shown collaged images of her face and nude bodies or body parts and testified that those images were not how the photographs originally appeared. Chamberlain testified she never saw anything like those images while she dated defendant, and he treated her well, aside from their mutual arguments.

## PRETRIAL

## A. Defendant's Competence To Stand Trial

Defendant argues the trial court abused its discretion by failing to declare a doubt concerning his competence to stand trial, suspend proceedings, and hold a competency trial. He contends that the trial court was obligated to initiate competency proceedings based on the evidence before it — largely in the form of defendant's conduct and in propria persona filings — suggesting that due to a mental impairment, defendant was unable to understand the proceedings and rationally assist counsel in his defense. We disagree.

On several occasions during the course of pretrial proceedings and at trial, defendant asked the trial court to relieve counsel, permit him to represent himself, or appoint different counsel. During pretrial proceedings, defendant moved to represent himself, and the court held a *Faretta*[7] hearing. At that hearing, defendant complained he was not

---

[7] *Faretta v. California* (1975) 422 U.S. 806.

being given "100 percent of everything" by his attorneys, and he specifically sought autopsy photos to compare against the medical examiner's report. The trial court asked defense counsel whether there were any concerns about defendant's competence. Counsel replied, "I don't know of anything, your honor, that would cause me to make a declaration under 1368." The court then asked whether counsel was aware of any disability that would interfere with defendant's ability to waive his right to counsel, and his attorney responded in the negative. The court also asked defendant directly for information related to competence: After advising defendant about the nature of self-representation in connection with a *Faretta* motion, it asked defendant about his mental health history. Defendant denied ever taking psychiatric medication or being treated for mental illness. The court asked if defendant wished to convey anything further, and defendant reiterated his request for copies of autopsy photos. The court pointed out the significance of waiving counsel, and defendant requested more time to consider whether he wished to do so. The court did not suspend proceedings then, or at any other time, to conduct a competency hearing.

About six months after the *Faretta* hearing, defendant twice sought the appointment of new counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118, claiming his attorneys were dishonest when communicating with him and failed to give him all discovery. Those motions were denied following in camera proceedings.

At the first *Marsden* proceeding, conducted to consider his request for new counsel, defendant alleged there was a general conspiracy among the court and counsel, and that his attorneys were lying to him. Defendant was especially concerned about

the pathologist's findings as to whether the victim was alive or dead during the sexual assault and the extent to which that mattered to substantiate a rape charge or special circumstance finding. The court and counsel expressed concern that defendant was wading into discussion of the cause of death, which was an area that should remain attorney-client privileged. Ignoring those warnings, defendant continued to explain that he disagreed with the pathologist's findings.

Shortly thereafter, defendant filed a second *Marsden* motion, and the court again conducted an in camera hearing to address it. At that hearing, counsel informed the court that defendant was consistently making demands on counsel concerning the investigation and defense strategy, explaining, "[T]here isn't any give-and-take with Mr. Parker. There's nothing that I can do that will . . . stop the torrent of marginally-relevant requests and demands on our time that — that keep us from preparing issues of unquestioned legal significance and magnitude." Cocounsel agreed that defendant was very engaged in the investigation, asking a number of questions — sometimes repetitively — despite having received answers to them during previous communications.

After defense counsel expressed frustration to the court concerning defendant's "constant forays into marginally-relevant areas; which, frankly, border on delusions sometimes," the court interrupted to ask whether counsel was "expressing concerns that would cause a suspension of the proceedings." Counsel responded in the negative, and the court agreed, stating it had "seen no[]" "basis on which to" suspend proceedings. Counsel also explained to the court that the defense had retained the services of a mental health expert to examine defendant regarding "threshold issues [of] competency and

22

sanity, Axis I diagnoses, mental health issues, to see if there were any mental health issues . . . that might impact the guilt phase or the penalty phase." Counsel stated that although defendant was not wholly cooperative with the expert's investigative efforts, the expert conveyed his belief that defendant did not "suffer[] from any mental health condition that would impact his competency or sanity" or that would rise to the level of a potential defense at the guilt phase of this case. The court ultimately denied the second *Marsden* motion.

Defendant filed no other *Marsden* motions and did not again complain about counsel until the conclusion of the guilt phase. Defendant "deliver[ed] a verbal *Marsden*" alleging his attorneys sometimes provided him conflicting information, colluded with opposing counsel, and counseled him against testifying on his own behalf. The court conducted in camera proceedings to address defendant's concerns, after which it denied his third *Marsden* request. These proceedings focused on defendant's desire to testify on his own behalf, counsel's conduct, and defendant's relationship with counsel; the court did not ask questions going specifically to defendant's competence.

Following the penalty phase but before a verdict had been reached, defendant submitted a lengthy handwritten motion alleging trial counsel had been ineffective and had colluded with the court and prosecution. In response, the trial court appointed an attorney with the alternate public defender's office to investigate whether the claim was meritorious. After the attorney concluded the claim lacked merit, the trial court heard and denied defendant's handwritten motion. At the hearing on that motion, the court stated its belief, given the high quality of advocacy provided by defense counsel and the alternate public

defender's office, that there was no attorney with whom defendant would have been satisfied.

On February 24, 2003, defendant submitted two copies of a second, lengthy handwritten document reiterating his concerns that a conspiracy between the defense, prosecution, and court existed. Appended to this filing were defendant's notes taken on various copies of pleadings and documents filed in his case. In a few instances, defendant drew sexually graphic sketches on these pages, all but one of which he made an effort to redact before submitting the document to the court. That document was initially filed under seal, but after defendant requested it be publicly filed and began reading it aloud during his sentencing hearing — during which he alleged collusion between the court and counsel — the document was publicly filed.

A defendant is incompetent to stand trial when "as a result of a mental health disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a); see *People v. Wycoff* (2021) 12 Cal.5th 58, 81–82 (*Wycoff*).) The trial court's "duty to assess competence is a continuing one." (*People v. Rodas* (2018) 6 Cal.5th 219, 236, fn. 5.) The obligation to suspend proceedings and hold a competency trial is triggered whenever " 'the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial.' " (*People v. Johnson* (2018) 6 Cal.5th 541, 575 (*Johnson*).) "The word 'substantial' does not mean that for a doubt to arise, there must be a large quantity of evidence of a defendant's incompetence; rather, it means that there must be some evidence of sufficient substance

that it cannot be dismissed as being inherently unpersuasive." (*Wycoff, supra,* at p. 83.)

The obligation to initiate formal competency proceedings arises "even if the evidence . . . is presented by the defense or if the sum of the evidence is in conflict." (*People v. Lightsey* (2012) 54 Cal.4th 668, 691.) "When faced with conflicting evidence regarding competence, the trial court's role . . . is only to decide whether the evidence of incompetence is substantial, not to resolve the conflict. Resolution must await expert examination and the opportunity for a full evidentiary hearing." (*People v. Rodas, supra,* 6 Cal.5th at p. 234.) "In other words, once a trial court has before it substantial evidence that a defendant is not mentally competent, its own observations of the defendant's competence cannot take the place of the formal competence inquiry . . . ." (*Wycoff, supra,* 12 Cal.5th at p. 83.)

"The decision whether to order a competency hearing rests within the trial court's discretion, and may be disturbed upon appeal 'only where a doubt as to [mental competence] may be said to appear as a matter of law or where there is an abuse of discretion.' " (*People v. Mickel* (2016) 2 Cal.5th 181, 195.) "[A]bsent a showing of 'incompetence' that is 'substantial' as a matter of law, the trial judge's decision not to order a competency hearing is entitled to great deference, because the trial court is in the best position to observe the defendant during trial." (*People v. Mai* (2013) 57 Cal.4th 986, 1033 (*Mai*).)

Defendant claims the trial court erred by failing to initiate competency proceedings based on the evidence the court had before it suggesting he may have been unable to rationally assist his attorneys in the conduct of his defense, including evidence of his "consistent mistrust of his counsel, his belief that there was

a conspiracy against him . . . [and] his belief that evidence in his case was fabricated." We disagree. Defendant asserts that over the course of his trial, he came to distrust his own attorneys, the prosecution team, and the court, becoming convinced that all "were joined in a conspiracy to fabricate evidence and secure a death sentence." As evidence that this distrust impaired his ability to rationally assist his attorneys, he points to the fact that he: submitted various documents to the court over counsel's objection, one of which contained a sexually graphic drawing; repeatedly attempted — sometimes successfully — against counsel's wishes, to put evidence before the court that could impair his defense; failed to cooperate with the mental health expert retained to evaluate his competence and possible defenses; and made a lengthy statement at his sentencing hearing again alleging collusion and disclosing evidence that could impair his defense. Defendant argues that although he was never overtly disruptive, this conduct should have alerted the court to the possibility that due to mental illness, he was unable to rationally assist counsel in the conduct of his defense.

Nothing in defendant's conduct suggests the court abused its discretion by failing to suspend proceedings to assess defendant's competence. (See *Johnson*, *supra*, 6 Cal.5th at p. 575.) An uncooperative defendant is not tantamount to an incompetent one. (See *Mai*, *supra*, 57 Cal.4th at p. 1034 ["We have frequently recognized . . . and have made clear that an uncooperative attitude is not, in and of itself, substantial evidence of incompetence"].) And here, although defendant was distrustful of counsel, at times disagreed with the defense strategy, and even publicly filed a document despite counsel's and the court's attempts to maintain it under seal, he was

actively engaged in his defense and generally cooperative with proceedings, as he concedes.

We see no substantial evidence compelling us to conclude that defendant's behavior resulted from mental illness as opposed to unwillingness to cooperate. (See *Mai, supra,* 57 Cal.4th at p. 1033.) Recently, in *Wycoff, supra,* 12 Cal.5th 58, 84, we concluded the trial court erred in failing to initiate competency proceedings when the court had before it a psychologist's report that constituted substantial evidence of the defendant's incompetence to stand trial as a matter of law. In the instant case, no mental health expert ever testified or reported defendant was unable to assist counsel, nor was there any other evidence before the court that constituted substantial evidence of the defendant's incompetence as a matter of law.

The court took steps to assure itself that defendant's mistrust of his counsel was not rooted in a mental impairment. Indeed, the court twice inquired of counsel whether proceedings should be suspended due to concerns about his competence, to which counsel responded in the negative. During the *Faretta* hearing, the court asked defendant's attorneys whether there were any concerns about his competence, to which they replied no. And it separately asked defendant whether he had taken psychiatric medications or been treated for mental illness, to which he replied he had not. At a *Marsden* hearing held several months later, when defense counsel noted defendant's requests "border[ed] on delusions sometimes," the court interrupted to ask whether counsel was concerned to a degree necessitating "a suspension of the proceedings." After defense counsel responded in the negative, the court agreed it had "seen no[]" "basis on which to" suspend proceedings. During defendant's second *Marsden* hearing, counsel told the court that an expert had

examined defendant and concluded there was no basis to assert he lacked competence. While an expert's opinion is not required to find a defendant incompetent, we have noted that "to discard [expert] evidence" when it is available "for mere psychiatric speculation" is "clearly outside our province." (*People v. Laudermilk* (1967) 67 Cal.2d 272, 288.) In the absence of evidence of incompetence that is substantial as a matter of law, we give great deference to the trial judge's decision not to initiate formal competency proceedings. (*Mai, supra*, 57 Cal.4th at p. 1033.)

Defendant complains that in denying his second *Marsden* motion, the court failed to acknowledge defendant's paranoia and delusions, because the court "viewed the motion only through the lens of the conventional *Marsden* inquiry" rather than more broadly assessing defendant's competence. That does not appear to be the case. When counsel mentioned defendant's requests seemed at times "delusional," the court immediately inquired after defendant's competence and was reassured by counsel that there were no issues of incompetence. " 'Although trial counsel's failure to seek a competency hearing is not determinative [citation], it is significant because trial counsel interacts with the defendant on a daily basis and is in the best position to evaluate whether the defendant is able to participate meaningfully in the proceedings.' " (*People v. Ghobrial* (2018) 5 Cal.5th 250, 273.) Particularly considering counsel's assurances, we cannot conclude that the trial court abused its discretion in failing to initiate competency proceedings.

We likewise reject defendant's assertion that his childhood history and the nature of the crimes he stood accused of committing constituted evidence of incompetence that would have " 'raise[d] a reasonable or bona fide doubt concerning the

defendant's competence to stand trial.' " (*Johnson, supra,* 6 Cal.5th at p. 575.) "In resolving the question of whether, as a matter of law, the evidence raised a reasonable doubt as to defendant's mental competence, we may consider all the relevant facts in the record." (*People v. Young* (2005) 34 Cal.4th 1149, 1217.) Because they constitute "relevant facts," we certainly may assess the nature of the charges and any evidence in the record regarding the defendant's childhood history. (*Ibid.*) As we have explained, however, " '[w]hen the trial court's declaration of a doubt is discretionary, it is clear that "more is required to raise a doubt than mere bizarre actions [citation] or bizarre statements [citation] or . . . psychiatric testimony . . . [of past] diagnos[e]s *with little reference to defendant's ability to assist in his own defense.*" ' " (*Id.* at p. 1218.) The facts of defendant's childhood history and the nature of the charges against him are not enough alone for us to conclude the court abused its discretion in failing to declare a doubt as to defendant's competence.

On this record, we cannot say as a matter of law that there was substantial evidence that defendant was unable to consult with his attorneys "with a reasonable degree of rational understanding." (*Dusky v. United States* (1960) 362 U.S. 402; see *Mai, supra,* 57 Cal.4th at p. 1033.) And for the reasons given above, we conclude the trial court did not abuse its discretion by failing to initiate competency proceedings. (*Mai,* at p. 1033.)

## B. Release of Television Production Company's Videotapes

Defendant argues his state and federal constitutional rights were violated by the trial court's pre- and posttrial rulings to seal and prohibit disclosure to defendant of videotapes. The videos, which were never broadcast, were prepared by a third

party television production company filming a reality television show and depict the prosecution team discussing defendant's case. He argues the trial court's rulings constitute error warranting reversal or, at a minimum, disclosure of the video footage under seal to defendant to determine whether further briefing is warranted. We conclude the trial court did not err.

Five months before the guilt phase began, defense counsel issued a subpoena duces tecum to Trial & Error Productions (TEP) seeking disclosure of video footage TEP had created of the prosecution team. TEP had been filming a documentary-style reality television show about district attorneys preparing for and trying cases, and defendant sought to obtain all "outtakes" of production related to his case, although no episode ever aired related to his case. TEP moved to quash the subpoena, arguing the footage was protected from disclosure by the California reporter's shield law (Cal. Const., art. I, § 2; Evid. Code, § 1070) and the First Amendment to the federal Constitution.

Following a hearing on the motion, the trial court ordered TEP to release the footage to the court so it could conduct an in camera review. The trial court reviewed four tapes: a recording of an interview with the victim's mother, which had previously been released to the defense; a recording of a meeting between former District Attorney Paul Pfingst and two deputy district attorneys discussing whether they would seek the death penalty in defendant's case; a recording of District Attorney Pfingst's announcement that the death penalty would be sought; and, a recording of a discussion between Attorneys Daly and Thompson concerning defendant's case. The trial court evaluated the factors outlined in *Delaney v. Superior Court* (1990) 50 Cal.3d 785 (*Delaney*) for when a defendant may overcome the shield law. The court ruled that defendant would receive a copy of the

first recording, but the other three videotapes would be sealed and retained with the record.

During record correction proceedings, defendant's appellate counsel requested copies of the sealed videotapes, and the trial court initially ordered the district attorney to make and provide copies to counsel. The prosecution requested the court withdraw its order after realizing the videotapes contained the TEP footage, alerting the court that no notice had been provided to the third party concerning the material's dissemination. The prosecution contacted NBC Universal Media, TEP's parent organization, which opposed in writing the dissemination of the tapes. The trial court agreed with the prosecution and vacated its earlier order to unseal the three videotapes, ordering the videotape containing the interview with Gallego's mother to be copied and provided to counsel, and for the other three videotapes to be resealed. Defendant filed a motion with this court seeking limited disclosure of the videotapes for appellate review, which we denied in an April 25, 2012 order.

Defendant argues, perfunctorily, that the trial court erred by denying him access to the videotapes during trial but focuses his argument before this court on the claim that his state and federal constitutional rights were violated by denying appellate counsel access to the tapes, asserting the appellate record is incomplete. His arguments are without merit. The videotapes are part of the record on appeal, but because they are sealed, defendant lacks access to them. We review independently any "records that remain sealed and to which defendant does not have access," keeping in mind that " '[p]arties who challenge on appeal trial court orders withholding information as privileged or otherwise nondiscoverable "must do the best they can with the information they have, and [we] will fill the gap by

objectively reviewing the whole record.' ' " (*People v. Avila* (2006) 38 Cal.4th 491, 606.) We have done so, and our independent review of the videotapes reveals there was no error.

The trial court's rulings — that trial counsel was not permitted access to the videotapes during trial and that appellate counsel was not entitled to them — were proper because the recordings are subject to and protected by the state's shield law and by the First Amendment to the federal Constitution. We review for abuse of discretion the trial court's application of the shield laws. (*People v. Ramos* (2004) 34 Cal.4th 494, 527.) As relevant here, the state's shield laws protect journalists from disclosing information acquired in the course of making news. (See Cal. Const., art. I, § 2, subd. (b); Evid. Code, § 1070.) The state's shield law provides, in pertinent part, that a journalist "shall not be adjudged in contempt by a [court] for refusing to disclose the source of any information procured while so connected or employed [as a news reporter], or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public." (Cal. Const., art. I, § 2, subd. (b).) "Unpublished information" includes recorded footage not shown to the public. (*Ibid.*; see also Evid. Code, § 1070 [statutory predecessor to Cal. Const., art. I, § 2, subd. (b)].) The shield law applies whether or not the information was provided in confidence. (*Delaney*, *supra*, 50 Cal.3d at p. 798.)

In *Delaney*, we explained that the shield law may be overcome only "on a showing that nondisclosure would deprive the defendant of his federal constitutional right to a fair trial." (*Delaney*, *supra*, 50 Cal.3d at p. 805.) A defendant must make a threshold showing that there is a reasonable possibility the information sought will materially assist with the defense. (*Id.*

at p. 808.)  The showing "need not be detailed or specific, but it must rest on more than mere speculation." (*Id.* at p. 809.)  If the defendant overcomes this threshold showing, the court then balances four factors to evaluate disclosure, including:  (1) whether the unpublished information is confidential or sensitive; (2) whether the interests sought to be protected by the shield law will be thwarted by disclosure; (3) the importance of the information to the defendant; and (4) whether there is an alternative source for the information.  (*Id.* at pp. 810–811.)

Defendant presents no argument supporting his assertion that the court abused its discretion by failing to unseal the records for trial counsel's review, and we see none.

With respect to whether there was error in failing to provide the videotapes to appellate counsel, as the Attorney General argues, defendant cannot make the requisite threshold showing because, as defendant concedes before this court, "his appellate counsel stated [during record correction proceedings] she did not necessarily plan to use the videotapes in her pleadings and that she would let the court and prosecution know if she decided to do so."  Defendant's right to discovery was not absolute, and when the court declined to provide the videotapes to appellate counsel, it reasonably exercised its " ' "wide discretion to protect against the disclosure of information which might unduly hamper the prosecution or violate some other legitimate governmental interest."  [Citation.]  This may be particularly true when the information sought is not directly related to the issue of a defendant's guilt or innocence.' " (*People v. Avila, supra,* 38 Cal.4th at p. 606.)

Defendant also fails to demonstrate any specific, nonspeculative reason why the recordings would aid in his

defense on appeal. He argues he is not required to demonstrate that the information sought would go to the " 'heart of the case,' " and claims the recordings would enable postconviction counsel to evaluate whether to raise claims of error, misconduct at the trial, or an unconstitutional charging decision. (*Delaney*, *supra*, 50 Cal.3d at p. 808.) These broad assertions fail to overcome the threshold of demonstrating there was "a reasonable possibility that the information sought [would] materially aid the defense."

Defendant argues the trial court deprived him of due process by basing its ruling on law that was not briefed. Defendant claims the court's pretrial analysis relied upon the *Delaney* standard exclusively. In its posttrial order, the court likewise ruled that "the factors outlined in *Delaney* are a reasonable way to weigh the materiality of materials sought in" subpoenas duces tecum to third parties. The court also explained the decision to quash the subpoenas duces tecum was discretionary and noted that using such subpoenas to conduct fishing expeditions was disfavored. Defendant claims this non-*Delaney* reason — that fishing expeditions are disfavored — deprived him of due process because he was not provided an opportunity to be heard on that subject. We disagree. The trial court denied defendant's request to unseal the recordings by relying on *Delaney* and noted in its analysis that although much of the state's common law on discovery had been statutorily superseded, "it appear[ed] that the legal aversion to 'fishing expeditions' expressed in *Pitchess*" remained applicable "with regard to subpoena's [sic] duces tecum to third parties." This passing comment, which did not alter the trial court's conclusion that the *Delaney* factors constituted "a reasonable way to weigh the materiality of materials sought in [third party] subpoenas"

did not deprive defendant of notice or an opportunity to be heard.

To the extent defendant's appellate argument can be construed as a request to unseal the videotapes, we note defendant has presented that request already — and properly, by way of separate motion — and we denied it. Defendant offers no reason that decision warrants reconsideration.

## GUILT PHASE

### A. Introduction of Collaged Images

Defendant argues the trial court erred by permitting the prosecution to introduce sexually graphic material at the guilt and penalty phases. Defendant contends most of the material introduced lacked relevance and was inflammatory and prejudicial. Defendant's claim lacks merit.

At defendant's preliminary hearing on February 28, 2001, Detective Hergenroeather testified that he found pornographic[8] magazines in Gallego's bedroom and a sexually explicit videocassette in her videocassette recorder. In defendant's bedroom, Hergenroeather found over 1,000 pages of pornographic materials, which included: images of Gallego with cutout images of penises, breasts, and other body parts pasted over her, or her head pasted over the naked bodies of other people; images of men and women with cut-and-pasted or drawn images of penises and vaginas over the underlying images; and

---

[8] Defendant claims it was error to allow "the prosecution to repeatedly refer to those materials as 'porn' or 'pornography,'" but failed to raise this argument before the trial court, forfeiting it on appeal. (See *People v. Mills* (2010) 48 Cal.4th 158, 194.)

an image of Gallego with a penis pasted over it and a handwritten, sexually explicit statement.

The prosecution sought to introduce some of this evidence at trial, arguing it was admissible to prove motive, intent, and state of mind; defendant, in contrast, argued the sexually graphic images, videos, and testimonial references were irrelevant. At a hearing on the motions, the trial court noted that "six to ten cubic feet of pornographic materials" were recovered from defendant's apartment. The prosecution requested a small fraction of that be presented to the jury, a three-to-four-inch stack, which materials would include writings and images. Specifically, the prosecution sought to introduce several examples of "morphed pornography," which included pictures of the body parts of multiple models cut and pasted over each other, or parts pasted onto images of people known to defendant, some of which had handwritten descriptions of body parts or functions written over them. The prosecution sought to introduce a subsection of the images that included cut-and-pasted images of Gallego, of Marilyn Powell's daughters, of Chamberlain, and an image with a reference to rape written on it.

During the hearing, the court described a few categories into which the pornographic images fell: those depicting young girls and women without pubic hair, those with sexually explicit handwriting added, and those featuring handcuffs. The court ruled that some of the material was relevant and admissible, explaining that while the prosecution was "obviously . . . entitled to show the jury the defendant's sexual content of his thoughts about the victim for intent, motive," it was concerned about "just the suffocating mass of it." The prosecutor sought to introduce images of Gallego to demonstrate

defendant's sexual interest in her and argued the photos involving Chamberlain, Powell, and Powell's children were relevant to demonstrate they were unaware of his interest in and his creation of such imagery during their relationships with him.

The trial court authorized admission of photographs involving or depicting Gallego, a few photographs of Powell and Powell's "adult and adult-looking friends and children," but excluded photographs depicting Powell's minor children and initially excluded those with Chamberlain. The court offered defense counsel the option of admitting just a sample of the standard pornographic images — rather than the larger collection of images — finding them admissible to demonstrate the volume of images found and that the images overwhelmingly featured women with shaved pubic hair. In admitting some pornographic images depicting women with shaved pubic hair — relevant in light of evidence that the victim was found with freshly shaven pubic hair and that the to-do list made reference to the shaving of pubic hair and to a "shaver cord" — the court explained, "[T]he point would be to show that there's other pornography and a lot of it and that it tends to focus on shaved women. [¶] And I would also then propose not pictorially but testimonially to have the jury aware of the mass, the quantity that there was, because I think that the quantity and the effort that obviously went into it is relevant to the threshold motive and intent issues."

The court noted it had excluded most of the sexually graphic evidence and had overruled defendant's objections based on Evidence Code section 352, due process, and relevance that it was "disposition evidence." Counsel argued he was continuing to object to the introduction of any other sexually

graphic images. The trial court suggested the prosecution prepare a photo board of those images and at further hearings, the parties continued to discuss the images to be included on the prosecution's photo boards, with defendant renewing objections to the introduction of many of the images. Of the thousands of images the trial court considered, a very small fraction was introduced.

In addition to the pornographic images, the court permitted the prosecution to introduce images of defendant's apartment, particularly those that depicted stacks of pornographic images, so the jury could get a sense of the volume of material found. The court also admitted a photograph of the pornographic videocassettes found in defendant's room.

At another hearing several weeks later, the parties discussed the images of Powell and her children, and of Chamberlain. The court excluded images depicting children, concluding that there would be a great deal "of evidence that's going to cause the jury to feel — to have some negative views of the defendant. I think the child porn risks demonizing him beyond repair in front of the jury." The court reasoned the prosecution could elicit the testimony it wanted from Powell — including her feelings upon learning defendant took and altered images of her children in sexually graphic ways — without introducing the images themselves. The court permitted some images of Chamberlain to be introduced for the limited purpose of determining whether she was aware of them during her relationship with defendant and, if not, whether her opinion of him was changed upon learning of the images' existence.

In addition to the photos and photo boards introduced at trial, and the prosecution's opening and closing statements,

Hergenroeather testified that he found hundreds of pornographic magazines, photographs, and videocassettes in defendant's home. Powell testified that defendant was generally interested in bondage and in "S&M" pornography, and she was unaware defendant had removed photographs of her and her family members from her home.

Defendant argues his state and federal constitutional rights[9] were violated by the admission of sexually graphic images and materials and by the "drumbeat of alleged 'pornography.'" He first contends the images were not obscene within the meaning of the First Amendment and that even if they were obscene, the First Amendment does not prohibit possession of such materials within the privacy of one's home. He argues the images constituted protected speech, his creation

---

[9] "With regard to this claim and virtually every other claim raised on appeal, defendant asserts that the error violated his rights to a fair trial and reliable penalty determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the California Constitution. In most instances, defendant failed to make these constitutional arguments in the trial court. Nevertheless, unless otherwise indicated, we consider the merits of these newly raised arguments because either (1) the appellate claim is of a kind that required no objection to preserve it, or (2) the claim invokes no facts or legal standards different from those before the trial court, but merely asserts that an error had the additional legal consequence of violating the Constitution. [Citation.] In those circumstances, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] Where rejection of a claim of error on the merits necessarily leads to a rejection of the newly asserted constitutional objection, no separate constitutional analysis is required and we have provided none." (*People v. Virgil* (2011) 51 Cal.4th 1210, 1233–1234, fn. 4.)

of collaged imagery was protected activity under the First Amendment, and "a criminal defendant's First Amendment activity is not admissible as evidence if it is wholly irrelevant to the elements of the crimes of which he was charged." As the Attorney General properly points out, defendant is not being punished for his possession of the materials, and he cannot shelter under a free speech privilege when the sexually graphic material was relevant to the charged offenses. (See *Dawson v. Delaware* (1992) 503 U.S. 159, 160 [holding "the First and Fourteenth Amendments prohibit the introduction in a capital sentencing proceeding of the fact that the defendant" engaged in protected associative activity if "the evidence has no relevance to the issues being decided in the proceeding"]; cf. *People v. Bivert* (2011) 52 Cal.4th 96, 118 ["Because evidence of defendant's associations and statements regarding race was relevant to issues in question, it was not made inadmissible merely by the fact it was also protected by the First Amendment"].)

Defendant claims the admission of sexually graphic images violated his state and federal due process rights because the images were used as character evidence and to demonstrate conduct on a specific occasion, in violation of Evidence Code sections 352 and 1101. " 'In reviewing the ruling of the trial court, we reiterate the well-established principle that "the admissibility of this evidence has two components: (1) whether the challenged evidence satisfied the 'relevancy' requirement set forth in Evidence Code section 210, and (2) if the evidence was relevant, whether the trial court abused its discretion under Evidence Code section 352 in finding that the probative value of the [evidence] was not substantially outweighed by the probability that its admission would create a substantial danger

of undue prejudice.” ’ ” (*People v. Carter* (2005) 36 Cal.4th 1114, 1166, quoting *People v. Heard* (2003) 31 Cal.4th 946, 972, in turn quoting *People v. Scheid* (1997) 16 Cal.4th 1, 13.) As defendant notes, evidence of a character trait is not admissible to demonstrate conduct on a particular occasion, but such evidence is admissible “when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act.” (Evid. Code, § 1101, subd. (b).) “We review the trial court’s rulings on relevance and the admission of evidence under Evidence Code sections 352 and 1101 for abuse of discretion.” (*People v. Battle* (2021) 11 Cal.5th 749, 799.)

Defendant argues that the trial court abused its discretion by admitting the sexually graphic images because they were more prejudicial than probative and lessened the state’s burden of proof. We disagree. The images were relevant to intent and motive to commit rape, highlighting defendant’s sexual interest in Gallego. There were numerous images of women without pubic hair and of women in handcuffs, which were of particular relevance in light of the fact that Gallego’s body was found with pubic hair removed and with an injury that could have been caused by restraint with handcuffs. In *People v. Memro* (1995) 11 Cal.4th 786, the defendant was charged with the first degree felony murder based upon the commission of lewd and lascivious acts upon a child under age 14, and we concluded that the defendant’s possession of pornographic images of young boys “yielded evidence from which the jury could infer that [the defendant] had a sexual attraction to young boys and intended

to act on that attraction." (*Id.* at p. 865.)  Like *Memro*, a jury could infer defendant was sexually attracted to and intended to engage in specific sexual acts with Gallego based upon the images he possessed.  Indeed, defendant had not simply collected pornographic images depicting women similar in appearance to his victim.  Instead, he spent significant time collaging photographs and magazines to create morphed images bearing his victim's face and the bodies of nude models with shaved pubic hair or wearing handcuffs.  The images were highly probative of both the degree of defendant's sexual interest in Gallego and his careful plans to fulfill a highly specific rape fantasy in which he subdued her, handcuffed her, and shaved her.

We likewise conclude the trial court did not abuse its discretion by admitting the images of Powell, Powell's adult children, and Chamberlain.  The court noted, as to these third party images, that the issue of admissibility was closer, and we agree.  But our review is highly deferential, and we "will not reverse a court's ruling on such matters unless it is shown ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' "  (*People v. Merriman* (2014) 60 Cal.4th 1, 74 (*Merriman*).)  The trial court's decision to admit this evidence does not meet this high standard.

As to relevance, some of the third party images depicted women with shaved pubic hair, which — in light of the victim's lack of pubic hair — heightened their relevance.  In addition, as the Attorney General notes, testimony from Powell and Chamberlain that they were unaware of defendant's creation and collection of these images allowed the jury to understand how Gallego could have unwittingly continued to live with

defendant while he created morphed pornographic images depicting her. Powell's relationship with defendant was close in time to the murder, and Powell testified that his sexual interests were "boring"; the images of Powell and her children countered that testimony and showed defendant in fact harbored violent fantasies about her and her children. Chamberlain's testimony that defendant was not the type of person to have created the graphic images of her when the two dated countered defendant's penalty phase mitigation theory that his significant childhood hardships were the root cause of defendant's crimes. The prosecution intended to suggest that defendant's relatively normal relationship with Chamberlain was proof that the fantasies and obsessions leading to the murder developed later and thus were caused by something other than his childhood trauma.

As to prejudice, the court weighed the images' prejudicial impact carefully, admitting only a few of the many available images. For example, to ensure the prejudicial impact was limited, the court excluded images of Powell's minor children. Any prejudice was also limited by the relatively brief nature of testimony regarding the images; Powell and Chamberlain simply confirmed they recognized the individual depicted in the collages and had not seen them previously.

We note that images of Powell, Chamberlain, and all of the sexually graphic images were clearly damaging to defendant but conclude the trial court did not abuse its discretion by admitting them as the trial court took great care to ensure the prejudice was limited. " 'As we have repeatedly explained: " 'In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' " ' " (*People v. Chhoun* (2021) 11 Cal.5th 1, 29.) For example, only a small sample of the "six to ten cubic

feet of pornographic material[]" was admitted. The jury was aware of the volume of material only via Hergenroeather's testimony and images of defendant's bedroom. The court carefully weighed the prejudicial impact of the images and excluded most of them, allowing only a handful of images related to Gallego, specifically; related to Powell and Chamberlain; and related to defendant's motive and intent. The court excluded as unduly prejudicial most images — including those depicting child pornography. And while the images that were admitted may have been disturbing to jurors, as sexually graphic images of young boys would have been to the jurors in *People v. Memro*, we conclude here as we did in that case that the trial court did not abuse its discretion by permitting the introduction of upsetting and graphic images because their probative value was not substantially outweighed by the potential for prejudice. (*People v. Memro, supra*, 11 Cal.4th at p. 865; see also *People v. Mora and Rangel* (2018) 5 Cal.5th 442, 480; Evid. Code, § 352.) This decision was not patently absurd, nor a miscarriage of justice. (*Merriman, supra*, 60 Cal.4th at p. 74; *People v. Miles* (2020) 9 Cal.5th 513, 587 (*Miles*).)

## B. Introduction of Victim and Crime Scene Photos

Defendant contends the trial court's admission of "gory, gruesome and inflammatory" crime scene and autopsy photographs constituted error in violation of his state and federal constitutional and statutory rights. We conclude the photographs were properly admitted.

Defendant sought to exclude certain photographs he claimed were irrelevant and inflammatory, including photographs of the area where Gallego's body was found, the PetSmart dumpster where her fingertips were found, the area where the bloodstained mattress was found, the apartment

defendant and Gallego shared, autopsy photographs and X-rays of Gallego's hands and head, slides prepared by Sperber, and defendant's arrest photos. The motion was addressed at an April 3, 2002 and June 13, 2002 hearing and over defense objection, a limited selection of the challenged photographs were admitted.

Defendant challenges the admission of these photographs arguing they were cumulative and irrelevant. " 'The admission of allegedly gruesome photographs is basically a question of relevance over which the trial court has broad discretion. [Citation.] "A trial court's decision to admit photographs under Evidence Code section 352 will be upheld on appeal unless the prejudicial effect of such photographs clearly outweighs their probative value." ' " (*People v. Brooks* (2017) 3 Cal.5th 1, 54.) Where probative value is minimal, photos are "inordinately gruesome," and the evidence is cumulative, admission may constitute an abuse its discretion. (*People v. Gurule* (2002) 28 Cal.4th 557, 625.) Defendant argues that testimony about the appearance of the crime scenes and diagrams of the relevant areas were adequate, and the images introduced were cumulative. We disagree.

Images like those depicting the interior of the U-Haul, the exterior of defendant's apartment, and the bloodstained mattress, provided jurors with visual information beyond what testimony could offer. The images of defendant's apartment complex bolstered testimony concerning the nature of the offense, including what might have been overheard by defendant's neighbors, and images of the bloodstained mattress and U-Haul bolstered testimony concerning the method of killing and disposition of the victim's remains. "[P]rosecutors, it must be remembered, are not obliged to prove their case with

evidence solely from live witnesses; the jury is entitled to see details . . . to determine if the evidence supports the prosecution's theory of the case." (*Ibid*.) These photographs were not particularly graphic, nor were they cumulative simply because testimony had also been offered addressing the subjects they depicted. Diagrams alone would have been inadequate to convey the full measure of information jurors were permitted to consider.

Defendant's claim largely centers on the admission of autopsy photographs, alleging they were inflammatory, cumulative, irrelevant, and unnecessary. Defendant's claim lacks merit. The images were relevant to show the nature of the victim's injuries, particularly her fatal neck wound, the shape and nature of her head wound, and the fact that her fingertips had been removed. Defendant argues that the photographs of defendant's hands and fingers were horrific and added little beyond what witnesses had testified to concerning "the victim's appearance and injuries, including post-mortem injuries such as removal of her fingertips." "The trial court has broad discretion over the admission of photographs that are alleged to include disturbing details. [Citations.] We routinely uphold the admission of autopsy photos to establish the placement of a victim's wounds and clarify the testimony of prosecution witnesses. [Citation.] The prosecution is not limited to proving its case 'solely from live witnesses; the jury is entitled to see details of the victims' bodies to determine if the evidence supports the prosecution's theory of the case.' " (*People v. Caro* (2019) 7 Cal.5th 463, 502.) While the images are upsetting, our review of the photographs reveals they "were not so gruesome as to have impermissibly swayed the jury." (*People v. Smithey* (1999) 20 Cal.4th 936, 974.) Indeed, any " 'revulsion they induce

is attributable to the acts done, not to the photographs.' " (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1215–1216.)

Defendant argues the introduction of the photographs constituted error because it permitted the prosecution to argue the killing was planned and methodical, undermining his theory that the crime occurred in the heat of passion. This argument lacks merit. The jury is entitled to review the evidence, including photographs, to ascertain whether the prosecution's theory is supported. (*People v. Brooks*, *supra*, 3 Cal.5th at p. 54.) Defendant objects to the "large quantity" of images introduced, claiming the court failed to conduct "individualized consideration" as Evidence Code section 352 commands. The record does not bear this out. Of the hundreds of images available, very few photographs of those areas were actually introduced. Moreover, the court was careful to clarify that the images would only "be visible while there's testimony about them, and then they're going to be put face to the wall." The court properly exercised its broad discretion in admitting the crime scene and autopsy images.

## C. Introduction of Photo of Victim and Her Dog

Defendant argues the trial court's admission of a photograph of Gallego with her dog improperly invoked jurors' sympathy and lacked relevance. He claims the erroneous admission violated his state and federal constitutional rights. We conclude the trial court did not err.

At a pretrial hearing on the admission of various photographs, defense counsel objected to the prosecution's planned use of a photograph of Gallego holding her dog, arguing that because the image was never one of the photos used in the collaged pornography, its use was not appropriate. Defense

counsel conceded an unmodified image of Gallego had relevance but argued the jury should view an enlarged version of one of the photographs used in the collaged pornography. The prosecutor explained none of the modified images could be enlarged without distortion, and after requesting and receiving photographs of Gallego from her family, this was among the only images that could be enlarged to a useful size. The trial court noted the image was somewhat sympathetic because the victim was depicted with "an itty-bitty, cute dog," but nothing about the image seemed overly prejudicial to the court in a manner violating Evidence Code section 352.

Defendant now contends that the trial court erred in admitting the photograph because it was unnecessary to identify the victim and because its probative value was outweighed by the prejudicially sympathetic effect it had on the jury. "We review the trial court's decision to admit photographs under Evidence Code section 352 for abuse of discretion. [Citation.] ' " 'The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect.' " ' [Citation.] ' "To determine whether there was an abuse of discretion, we address two factors: (1) whether the photographs were relevant, and (2) whether the trial court abused its discretion in finding that the probative value of each photograph outweighed its prejudicial effect." ' " (*People v. Peoples* (2016) 62 Cal.4th 718, 748.)

Defendant claims before this court that the photograph was not relevant to any contested issue. Were we to write on a blank slate, defendant's argument might be persuasive given the absence of any factual dispute over the identity of the victim. However, defense counsel conceded before the trial court that an

unaltered or "before" image of Gallego was "relevant," "admissible," and "clearly . . . ha[d] an evidentiary value to this case" "given other photographs that have been admitted in relationship to morphing," and also "for, primarily, identification at the guilt phase." Thus, defendant conceded relevance of a photo of the victim, and that is not at issue here. Instead, defendant's primary objection before the trial court was that the jury not be shown this specific photograph of the victim with her dog.

"We have long advised trial courts to exercise care when deciding whether to admit during the guilt phase of trial photographs of a capital murder victim while alive because of the risk such evidence 'will merely generate sympathy for the victim[].'" (*People v. Brooks*, *supra*, 3 Cal.5th at p. 56.) An "otherwise relevant" photograph of the victim in life need not be excluded despite the possibility it could elicit a sympathetic response from the jury. (*Ibid*.) As the prosecution argued and defendant conceded at the hearing regarding the exhibit's admission, because there were numerous images of Gallego in sexually graphic collages and those images could not be enlarged without distortion, use of an unaltered image of Gallego was necessary to allow jurors to clearly view the victim.

Gallego's father briefly identified the victim in his testimony from this photograph, and as defense counsel conceded, a clear photograph was "relevant given other photographs that have been admitted in relationship to morphing." Although defendant would have preferred to enlarge the victim's face from an image used in the sexually graphic collages, that was not possible without the images becoming "distort[ed]" or having "big red spots." Gallego's family provided a few images to the prosecution from which this

49

image was ultimately selected, and most of those also could not be enlarged without distortion. Having conceded certain photographs of the victim would have been relevant and admissible, we cannot agree with defendant that using this particular photograph was "calculated to 'inflame' and 'enrage' the jury." The exhibit is a roughly 15-inch square posterboard depicting Gallego's placid face next to her dog, Julie. Gallego's face takes up approximately an eight by 10 inch portion of the poster, with the dog's face taking up a similar amount of space. While an image of the victim with her dog "arguably posed some risk it would elicit sympathy from the jury, nothing about the manner in which [her] likeness was displayed or the photograph's background suggests it was ' "particularly calculated" ' to do so." (*People v. Brooks*, *supra*, 3 Cal.5th at pp. 56–57, quoting *People v. Smithey*, *supra*, 20 Cal.4th at p. 975.) Indeed, the trial court was cognizant of both the general principle that certain photographs of a victim could become "so prejudicial," but balanced that concern with the practical restraints it faced here. And this was among the only images available of the victim that could be enlarged without distortion. The court did not abuse its discretion admitting the photograph. (*People v. Brooks*, at pp. 56–57; see also *People v. Tully* (2012) 54 Cal.4th 952, 1020 [upholding trial court's conclusion that image of victim in life wearing her nursing uniform was relevant and admissible].)

### D. Introduction of Photo of Victim's Handcuffed Body

Powell was shown a photograph of Gallego's postmortem body wearing handcuffs to provide testimony regarding whether the handcuffs were similar to the type defendant used to lock his bicycle. Defendant argues it was error to introduce the

photograph and to have allowed Powell to view it. For the reasons that follow, we conclude the trial court did not err.

Powell testified that when she dated defendant, he rode a bicycle to her home several times a week and locked that bicycle with handcuffs. She described the handcuffs as "big, heavy, strong, silver, heavy ones" with a chain between the bracelet portions of the cuffs. When Sperber examined Gallego's body following her autopsy, he placed standard-issue law enforcement handcuffs on her wrists and positioned her arms behind her back to determine if a mark left on her back could have been made by handcuffs. Powell agreed the handcuffs in that image looked like the type defendant used as a bicycle lock.

Before she testified, defense counsel objected on relevance and Evidence Code section 352 grounds to allowing Powell to view the photograph, arguing that the image had no relationship to her expected testimony that she had seen defendant with handcuffs. The prosecution replied that Powell was expected to testify that defendant used handcuffs to lock his bicycle and would describe their appearance and his method of storing them. Defendant argued a courtroom bailiff's handcuffs could be shown to Powell, rather than the photograph. The court rejected that suggestion, allowing the prosecution to show the admittedly gruesome image to Powell and noting the jury had already seen it. The court ensured Powell was shown the photograph prior to testifying to avoid undue shock. It reasoned that Powell should testify about the image, rather than a bailiff's handcuffs, because there had been extensive argument about whether defendant owned handcuffs, what they looked like, and the legitimacy of Sperber's experiment using handcuffs to assess whether the mark on Gallego's back was made by a similar pair.

51

Defendant claims introducing the photograph and showing it to Powell constituted error because it was irrelevant, inflammatory, and cumulative. There was no error. As we explained above, " 'The admission of allegedly gruesome photographs is basically a question of relevance over which the trial court has broad discretion.' " (*People v. Brooks*, *supra*, 3 Cal.5th at p. 54.) We will uphold the trial court's decision unless we conclude " ' "the prejudicial effect of such photographs clearly outweighs their probative value." ' " (*Ibid*.)

Although the photograph is upsetting, it was probative of a central prosecution theory: that defendant handcuffed his victim in the course of her murder. Accordingly, its introduction generally did not constitute an abuse of the trial court's discretion. (See, e.g., *People v. Booker* (2011) 51 Cal.4th 141, 170–171 [no error in introduction of numerous autopsy photos to demonstrate theory of offense].) Defendant argues that because Powell was not a witness to the murder or Sperber's experiment with the handcuffs, showing the photo to Powell constituted error because it did not advance the state's case. Defendant's argument misapprehends the purpose of Powell's testimony. She was not providing evidence that the handcuffs pictured were used in the murder; her testimony was instead that defendant had owned handcuffs similar to the type pictured: heavy, and with a chain connecting the bracelets. Although Powell was not a witness to the homicide or postmortem experiment, she was among the only witnesses to testify she had seen defendant with handcuffs. The prosecution's theory of the case involved defendant subduing or binding the victim with handcuffs, but no handcuffs were ever located. Testimony was presented that marks on the victim's body were consistent with having been handcuffed by an object

similar to police-issued handcuffs with a chain between the bracelets, like the type Powell testified defendant had owned.

Defendant argues Powell could have been shown similar handcuffs, and the only reason the photograph was shown to her was to inflame the jurors and horrify the witness. This argument lacks merit; the photograph Powell viewed had already been introduced, and the jury had viewed it. The court indicated it had no "basis to believe [Powell was] any less able than the jurors to view" the photograph. Even so, the court took care to ensure there would be no "undue shock" to Powell; she had confirmed she was comfortable viewing the image and was shown the image prior to testifying. The court committed no error in permitting Powell to view the photograph.

### E. Tool Mark Expert

Defendant argues his rights under the federal and state Constitutions were violated by the introduction of tool mark expert Sperber's testimony that the marks on Gallego's back appeared to have been made by handcuffs.[10] We see no error.

---

[10] This court is familiar with Sperber from our decisions in *In re Richards* (2012) 55 Cal.4th 948 (*Richards I*) and *In re Richards* (2016) 63 Cal.4th 291 (*Richards II*). In *Richards I*, "this court rejected [the petitioner's] claim on habeas corpus that his conviction should be overturned because the prosecution's dental expert," Sperber, "had recanted his expert opinion testimony at trial that a lesion on [the victim's] hand was a human bite mark matching petitioner's unusual teeth." (*Richards II*, at p. 293.) After the Legislature amended the relevant statute to provide that the definition of false evidence included repudiated expert evidence, we concluded it was "reasonably probable that the false evidence presented by Dr. Sperber at petitioner's 1997 jury trial affected the outcome of

Defendant moved to exclude Sperber's expert testimony regarding tool markings made on Gallego's body. At the Evidence Code section 402[11] hearing, the trial court acknowledged that Sperber had testified as a bite and tool mark expert in his courtroom on prior occasions, and it was likely Sperber would again qualify as an expert. At that hearing, Sperber explained that he served as a testifying tool mark expert in roughly 20 previous cases. He received training in dental school regarding the impact of tools and teeth on soft tissue, including inflammatory and cellular changes. The court asked him what specific training made him expert in tool mark identification, such as handcuffs, as opposed to dental identification, and he expanded on his dental and medical coursework providing a background in that information. He explained that while attending New York University's dental school, dental students and medical students attended some of the same classes in subjects like "histology [and] cytology" — i.e., cellular and tissue structure and function — because, "no matter the part of the body" to be treated, the training is "analogous." Sperber told the court that he consulted with law enforcement regarding a rectangular mark on Gallego's back and became suspicious that handcuffs caused the mark after learning defendant possessed handcuffs at some point. He examined Gallego's body, applied handcuffs by bending her arms behind her back in a natural position, and noted the mark

that proceeding" and granted the habeas corpus petition. (*Id.* at p. 315.)

[11] Evidence Code section 402 provides in pertinent part, "The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury . . . ." (*Id.*, subd. (b).)

was close to where the handcuffs fell and was approximately the length of the ratchet portion of the handcuffs. Sperber noted that marks on Gallego's arms, in addition to the mark on her back, caused him to think her injuries could have been made by handcuffs.

The trial court ruled Sperber's opinions could be helpful to the jury, and the parties remained free to argue about the weight of his opinions. It reasoned Sperber's education and experience informed his opinion and overruled defendant's objections to Sperber providing testimony about handcuffs causing the marks Gallego's body. The trial court reasoned Sperber possessed "more than ample qualifications" to render this opinion, and no specific, formal classroom education in toolmark identification, as distinct from dentistry, was required to be a qualified as an expert.

At trial, Sperber testified that he was a dentist and an expert on tool markings, which included marks made by teeth and other objects on hard and soft surfaces, including tissue. Sperber consulted on high-profile matters like making identifications at the World Trade Center, and on the Jeffrey Dahmer and Ted Bundy cases, working all over the United States and internationally. At the time of defendant's trial, he had over fifteen years of experience in assisting law enforcement with identifying marks left by objects, including a watch imprint on a victim's forehead, a canine bite mark, a ligature mark made by a telephone cord, and numerous others. He had experience consulting in cases involving handcuff marks on two prior occasions.

Sperber's consultation in this matter involved him viewing photographs and then, on August 24, 2000, examining Gallego's

body. He noted a mark on Gallego's back, slightly smaller than a finger, which he believed may "have been produced by handcuffs in between the back of that individual, of the victim, and whatever surface she had been on when the handcuffs had been applied." Sperber looked at Gallego's back, at photographs, and — using handcuffs that had been obtained from the police department — manipulated Gallego's hands behind her back with handcuffs secured around them "the way people are normally handcuffed when they're seen on television or in newspaper articles, things of that nature." He observed that the solid portion of the handcuffs, the ratchet, was "almost exactly over" the mark on Gallego's back.

Defendant argues before this court that the allegedly minimal scientific value of bite mark identification rendered introduction of Sperber's testimony improper despite the fact that Sperber addressed tool, not bite, marks. Defendant argues the field of bite mark expertise is increasingly discredited and contends that exaggerated claims made by forensic experts have been a leading cause of wrongful convictions. He argues "the unproven reliability" of bite mark analysis rendered the analysis Sperber *did* perform in this case — tool mark analysis — "exponentially worse." However, unlike bite mark analysis, tool mark analysis more generally identifies what implement *could have* left a mark (i.e., this mark could have been made by a handcuff), not what particular implement *actually did so* (i.e., these were the actual handcuffs that were used). In this way, the analysis performed here is very different from the bite mark analysis upon which defendant relies, whereby experts are asked to use bite marks to identify the actual individual who would have left those marks. Here, the aim was not to suggest the mark on Gallego's back was made by

defendant, but whether the mark could have been made by handcuffs, generally.

Defendant claims that expertise in bite marks may not satisfy the *Kelly*[12] rule's requirements of expert reliability and specialized knowledge, but even if it did, Sperber's testimony should have been excluded because it was more prejudicial than probative. We disagree. Because Sperber's methodology in this case " 'isolate[d] physical evidence whose existence, appearance, nature, and meaning [were] obvious to the senses of a layperson, the reliability of the process in producing that result is equally apparent and need not be debated under' the *Kelly* rule." (*People v. Cowan* (2010) 50 Cal.4th 401, 470.) Sperber observed that marks on Gallego's body were consistent with a type of implement, an observation "jurors essentially [could] see for themselves." (*People v. Venegas* (1998) 18 Cal.4th 47, 81.) Because his testimony involved no " 'new scientific technique,' " it is not subject to the strictures of the *Kelly* rule. (*Id.* at p. 76.)

We will not disturb a trial court's discretionary determination that a witness qualifies as an expert absent manifest abuse of that discretion. (*People v. Morales* (2020) 10 Cal.5th 76, 97.) Such abuse is found when a witness is clearly unqualified to serve as an expert. (*Ibid.*) " ' " ' "Where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than to its admissibility." ' " ' " (*Ibid.*) We also evaluate the trial court's decision to admit an expert's evidence for abuse of discretion and

---

[12] See *People v. Kelly* (1976) 17 Cal.3d 24.

"will not disturb a trial court's admissibility ruling ' "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Ibid.*; see also *People v. Cooper* (1991) 53 Cal.3d 771, 813.)

The trial court did not err by concluding Sperber was qualified to serve as an expert. The evidence did not show Sperber " ' " ' "*clearly lack*[ed] qualification as an expert." ' " ' " (*People v. Morales, supra,* 10 Cal.5th at p. 97.) To the contrary, the trial court evaluated Sperber's qualifications and experience, reasoning that while there was no formal training on tool mark analysis, Sperber would have been the type of expert to have received such training if it existed. The trial court noted that experience, rather than formal education, was an adequate way to become an expert in certain circumstances, that Sperber had more experience than anyone else the trial court was aware of in the field of tool mark identification, and he had a national reputation for being adept at such analysis. Sperber had extensive experience identifying "handcuffs and handcuff marks," as well as years of experience "observing postmortem examinations" and "questioning the medical examiners."

To the extent defendant argues that bite mark analysis is an increasingly discredited method to establish identity, we note the tool mark analysis performed here served a different purpose: to show a mark on the victim was likely made by a particular tool, not a particular person. We see no evidence to support a conclusion that Sperber was "clearly" unqualified to perform that analysis, particularly in light of the over 20 cases in which he had previously testified as a tool mark expert, and we conclude the court did not abuse its discretion in admitting

Sperber's expert testimony. (*People v. Morales*, *supra*, 10 Cal.5th at p. 97.) Indeed, Sperber's knowledge exceeded the common experience of jurors, as he identified that the "circumferential" marks on Gallego's wrists likely came from handcuffs, noted the "fairly parallel and straight" marks on the victim's back matched certain parts of handcuffs, and determined that a particular type of bruising, as distinct from an abrasion, was likely caused by the "type of pressure, force, or impact," resulting from "one person on top of another person."

Defendant argues that because Sperber examined Gallego's body days after it was found and autopsied, there was postmortem distortion of the skin due to decomposition and distortion due to excision and clamping of the relevant area. This distortion, argues defendant, rendered Sperber's opinion that the mark on Gallego's back matched a handcuff ratchet incredible. We see no merit to this argument. Sperber's testimony was based on photographs as well as physical examination, and he made clear that while the passage of time may have eroded some evidence of abrasions on Gallego's skin, there was no slippage or extreme decomposition to the extent the shape or location of the bruise could have been impacted. Sperber's credibility was a matter for the jury's consideration, and to the extent it was impacted by the timing of his examination, the jury was free to consider that. (See *People v. Morales*, *supra*, 10 Cal.5th at p. 97.)

Defendant claims Sperber's testimony was merely that the marks on Gallego's back were "consistent with" being made by handcuffs, which language constitutes "a weak estimate of association" that juries typically misinterpret as conveying a greater degree of certainty. Indeed, while the court admitted Sperber's testimony concluding it could be helpful to the jury, it

also noted that the weight of his opinions were a matter for the attorneys to argue. To the extent defendant claims the language Sperber used was not sufficiently exacting, he was free to argue before the jury — and did — that it should accord the opinion little weight. Defense counsel elicited on cross-examination that Sperber's use of the equivocal word "could" in his report mean Sperber believed it "might be handcuffs or it might not be." The trial judge noted that this "was probably the most effective, destructive" cross-examination he had "ever seen in a courtroom." Defense counsel urged the jury in closing argument to discredit Sperber's testimony. And as the Attorney General points out, the jury was instructed with CALJIC No. 2.80, explaining that they were not bound by an expert witness's opinion and were free to disregard any opinion they found to be unreasonable.

Defendant's argument also fails because the portion of the record defendant quotes as inexact relates to Sperber's testimony about the circumferential mark on Gallego's wrist, not the mark on her back. In fact, with regard to the more particular marks on Gallego's back, Sperber testified that the solid portion of handcuffs was almost exactly over the mark when her hands were bound behind her back, and a bruise would be made by the pressure or weight of a body pressing down on that area.

The trial court's admission of Sperber's testimony was not arbitrary, capricious, or patently absurd, nor did it result in a manifest miscarriage of justice. (*People v. Morales*, *supra*, 10 Cal.5th at p. 97.) Defendant claims that its admission nonetheless ran afoul of Evidence Code section 352's command that the probative value of Sperber's testimony be weighed against its prejudicial effect. We disagree. Defendant claims

that because the probative value of Sperber's testimony was "thoroughly unreliable," its only impact was prejudice. To violate Evidence Code section 352, there must be a substantial risk of prejudice, confusion, or consumption of time. Defendant claims that risk arose because Sperber was an expert, and he opined about the manner of death. "A party cannot seek to exclude evidence merely because it is helpful to the other side." (*People v. Brown* (2014) 59 Cal.4th 86, 102.) Defendant's allegation amounts to no more than a complaint that the evidence was helpful to the prosecution's theory of the case. We conclude no error resulted from the admission of Sperber's expert testimony.

Even if we assume the trial court erred in admitting Sperber's expert testimony, the error was clearly harmless under any standard. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) [error in violation of state law is harmless if it is not reasonably probable that a result more favorable to the defendant would have occurred in its absence]; *Chapman v. California* (1967) 386 U.S. 18, 24 ["before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"].) Photographic evidence showed there were marks around the victim's wrists. Hergenroeather and Holmes both testified those marks resembled handcuff bruising.

There was also ample evidence of defendant's guilt of murder and rape or intent to commit rape. Defendant and Gallego were not engaged in an intimate, sexual relationship. DNA evidence from blood in defendant's apartment and in the U-Haul truck he rented matched Gallego's, and DNA evidence from semen on Gallego's mattress matched defendant. Defendant made a to-do list describing sexual acts, items needed

(such a shaver cord), and a note to "burn palms + face thoroughly." The autopsy revealed that Gallego's hands were indeed burned. On his to-do list, he also indicated that he needed a five-day hiatus from work, which aligns with the time off he requested. As indicated on his to-do list, at some point after Gallego got home from work on August 10, 2000, defendant locked and closed the apartment's doors and windows, subdued and gagged Gallego, sexually assaulted her, hit her over her head, and cut her neck so deeply her jugular vein was severed. Receipts for the U-Haul, bolt cutters, and trash bags were found in defendant's apartment. Defendant planned to take Gallego's money after killing her, which was evident from his early review of her bank balances and his efforts to withdraw and transfer funds from her account. Defendant told his cellmate in county jail, Lee, that he killed his Brazilian roommate after learning he could steal more money from her if she died than he would earn by marrying her, drained her blood in a bathtub, and tried to hide her identity by removing her fingertips with a bolt cutter. Even if we were to conclude that the introduction of Sperber's testimony constituted error, we are convinced beyond a reasonable doubt that the error would not have contributed to the verdict.

## F. Introduction of Sperm Cell in Banana Peel

Defendant argues the trial court erred in admitting evidence of a single sperm cell found on a banana peel in a trash bag recovered from the PetSmart dumpster. We find no error.

A swab taken from a banana peel found in the same trash bag as defendant's to-do list and "do not disturb" sign revealed a single sperm cell. The bag was discarded in the dumpsters where Gallego's fingertips were found. The prosecution sought

to introduce the evidence, arguing that because defendant's to-do list included a cucumber as well as sexual acts, the sperm cell on the banana peel was relevant and admissible. Defendant objected, arguing the cell — which could not be genetically linked to defendant — was irrelevant and prejudicial. He contended the evidence invited jurors to speculate defendant sexually assaulted the victim with the banana and then ate it. In evaluating the admissibility of the sperm cell, the court noted that the peel's location in the same bag as defendant's to-do list suggested the items shared a more "dramatic connection" than if the banana peel had been found elsewhere in the dumpster. The court admitted the evidence.

At trial, Montpetit testified he examined the banana peel and found a single sperm cell from an unknown donor but found no blood or epithelial cells from the victim on it. Had the peel come in contact with the victim's soft tissue, it was possible her epithelial cells would have transferred onto the peel. As to the single sperm cell, Montpetit explained that it was too small a sample to test for DNA and that male ejaculate typically contains approximately three billion sperm cells.

Defendant now argues the trial court's admission of the sperm cell evidence was erroneous because the evidence lacked relevance, and its prejudicial impact "far outweighed" its probative value. " 'A trial court has "considerable discretion" in determining the relevance of evidence. [Citation.] Similarly, the court has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects.' " (*Miles, supra,* 9 Cal.5th at p. 587.) Evidence is relevant when it " ' "tends 'logically, naturally, and by reasonable inference' to establish material

facts such as identity, intent, or motive." ' " (*People v. Young* (2019) 7 Cal.5th 905, 931.) We review the trial court's evidentiary decision for abuse of discretion, disturbing it only if we conclude that the trial " ' " ' "court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " ' " (*Miles*, at pp. 587–588.)

We conclude the trial court very thoughtfully evaluated the admissibility of the sperm cell evidence. It reasoned, "That there is spermatozoa [*sic*] in the trash at all established some microscopic relevance. And I use that both in terms of size and significance of the issue. The fact that it's on a banana peel adds somewhat to its weight in an evidentiary way. In light of all this — not just the reference to the cucumber, but all the totality of the evidence relevant to intent and planning in this case, the fact that there is a sperm on the banana peel is circumstantial evidence" of sexual contact. The trial court acknowledged that it may be "weak [evidence, but that] doesn't make it irrelevant." Defendant argues the evidence lacks relevance because the sperm cell's source is unknown, and it could have transferred to the banana peel from other, untested items in the same bag. The trial court considered those arguments, concluding the evidence was "not particularly" "powerful" and its credibility was susceptible to multiple attacks. But the weakness of the evidence does not undermine its relevance. Defendant was given an opportunity to test the strength of the evidence on cross-examination, during which Montpetit agreed there was no "scientific evidence that the sperm [was] necessarily" defendant's, nor "scientific evidence that the banana peel was ever in contact with" the victim. The trial court's decision to

admit it was certainly not arbitrary, capricious, or patently absurd; accordingly, we will not disturb it.

Nor are we persuaded that the evidence was more prejudicial than probative. Defendant argues admission of the sperm cell evidence is equivalent to the improper admission of character evidence to prove conduct on a specific occasion under Evidence Code section 1101, and that it improperly reduced the prosecution's burden of proof. We disagree. Defendant's to-do list included a cucumber and a list of sexual acts. As the court acknowledged, this evidence did not present a "pretty picture" of defendant. But damaging evidence is not necessarily prejudicial. (See *People v. Chhoun, supra*, 11 Cal.5th at p. 29.) " 'The "prejudice" which [Evidence Code] section 352 seeks to avoid is that which " ' "uniquely tends to evoke an emotional bias against the defendant as an individual *and which has very little effect on the issues*." ' " ' " (*Ibid.*) The sperm cell was found on a banana peel, and the peel was discarded in the same trash bag as defendant's to-do list — which included a cucumber and a number of sexual acts. While the image of defendant assaulting the victim with a banana before eating and discarding it is upsetting and evocative, the location of the discarded peel in the same garbage bag as the to-do list and handwritten "do not disturb" sign discarded from defendant's home heightens its relevance. The trial court did not abuse its discretion in admitting a banana peel with a sperm cell found on it, recovered in close proximity to a to-do list linked to defendant, that described a number of sexual and other acts performed in connection with Gallego's murder. Defendant's planning for his crimes and his intent to sexually assault Gallego were central issues in the case. The trial court did not abuse its discretion by

concluding the sperm cell located on a banana peel was admissible as potentially relevant to those issues.

As the Attorney General notes, the evidence of the sperm cell, while relevant, was not nearly as prejudicial as some of the other evidence against defendant, including the to-do list found in the same trash bag. The court reasoned that while relevant, the evidence was not especially powerful, and its credibility was subject to attack. The trial court weighed the probative value of the evidence carefully, as well as its potential to confuse jurors, suggesting the jurors need not be "biochemist[s]" to understand the "basic concept[s]" at issue. The court also suggested it would not take an "inordinate amount of time" for the prosecution to present the evidence but ensured the defense would be given "every opportunity" to present the factual basis underpinning its interpretation of the evidence. The court's ruling was not arbitrary, capricious, or absurd, and we conclude there is no reason to disturb it. (*Miles*, *supra*, 9 Cal.5th at pp. 587–588.)

## G. Impeachment Testimony of Jailhouse Informant

Defendant claims the trial court erred by limiting his cross-examination and impeachment of Lee in violation of his state and federal constitutional and statutory rights. We conclude no error occurred.

Lee testified for the prosecution regarding defendant's jailhouse confession. Defendant confided his plans to steal from Gallego and described how he killed her, cut off her fingertips, and disposed of her body. Defense counsel sought to impeach Lee with his prior criminal convictions, including: Lee's 1967 robbery and burglary convictions; his 1990 conviction for possession for sale; his 1993 conviction for willful infliction of corporal punishment; his admission of using drugs in August

2000; his 2002 admission of criminal threat; his admission of using rock cocaine from 1975 to 2002; and his 2002 conviction for false representation of identification to a peace officer.

The trial court ruled that the defense could impeach Lee with the 2002 false representation conviction if he denied the underlying conduct. The court also ruled defendant could impeach Lee with violating his restraining order, the incident that gave rise to his restraining order, his conviction for sale of narcotics in 1990, and his misdemeanor conviction for willful infliction of corporal injury in 1993. The court ruled that Lee's 1967 convictions were too old to be relevant. Defendant objected, contending that the 1967 robbery and burglary convictions remained relevant because Lee was facing a life sentence under the "Three Strikes" law, and he was hoping to receive some relief by testifying. The court ruled the 1967 offenses were generally precluded but agreed that if Lee's status under the Three Strikes law was raised, defendant would be permitted to address those convictions on cross-examination.

During Lee's cross-examination, defense counsel questioned Lee about his prior convictions and admissions. Specifically, Lee agreed he pleaded guilty to the possession of rock cocaine for sale in 1990, pleaded guilty to violating a restraining order in August 2000, lied to police about his name in January 2002, and used illegal drugs as recently as the day before he was arrested and booked into county jail. Lee denied that he was guilty of spousal abuse in 2000 and testified that he might have been convicted of spousal abuse in 1993. Lee further denied threatening his mother or her husband in March or June 2000.

Defendant now claims the trial court's limitation on his cross-examination of Lee violated his rights to confrontation and counsel, lessened the state's burden of proof, and undermined the heightened reliability requirement of capital trials. We disagree. Defendant fails to support the bare assertion that his right to confrontation was violated by the trial court's order. Although a witness may be impeached with any prior conduct involving moral turpitude (*People v. Clark* (2011) 52 Cal.4th 856, 931), trial courts possess broad latitude to exclude examination concerning a witness's prior conviction if it finds the prejudicial impact substantially outweighs its probative value. (*People v. Anderson* (2018) 5 Cal.5th 372, 407.) One factor a trial court considers when determining whether a prior conviction is admissible for impeachment purposes is whether that conviction "is near or remote in time." (*People v. Clark*, *supra*, 52 Cal.4th at p. 931.) The 33-year gap between Lee's 1967 convictions and defendant's trial is certainly "remote" in time. (*Ibid*.; cf. *People v. Edwards* (2013) 57 Cal.4th 658, 722 [1994 murder and burglary convictions not remote in time to 1996 trial].) Moreover, the court would have permitted defendant to question Lee concerning the 1967 convictions had Lee's status as a third strike offender been raised; it was not. No error resulted from the lack of cross-examination on Lee's 1967 offenses.

We note that additional considerations apply when the impeachment evidence is something other than a prior conviction because " 'such misconduct generally is less probative of immoral character or dishonesty and may involve problems involving proof, unfair surprise, and the evaluation of moral turpitude.' " (*People v. Clark*, *supra*, 52 Cal.4th at pp. 931–932.) Defendant argues he was not permitted to fully explore Lee's

drug history and related arrests, arguing the court's ruling prohibiting cross-examination on certain subjects falsely inflated Lee's credibility and reliability undermining the heightened requirement of reliability in capital cases. Although Lee was not cross-examined concerning his 33-year-old offenses, defendant was able to cross-examine Lee concerning every other item on his criminal record: his 1990 conviction for possession of the sale of narcotics; his 1993 conviction for willful infliction of corporal injury; his 2000 conviction for violating a restraining order and the incident that gave rise to it; and his 2002 conviction for false representation of identification to a police officer. The jury was fully apprised of Lee's credibility and reliability when determining how much weight it should accord his testimony. Accordingly, the trial court did not abuse its discretion by limiting the use of impeachment evidence against Lee.

## H. Defense Examination of Police Officer Procedures

Defendant claims the trial court erred by limiting his cross-examination and impeachment of Detective Ott in violation of his state and federal constitutional rights. We conclude there was no error.

Defendant sought to cross-examine Ott regarding alleged instances of variation from standard police practices, which the trial court denied. Defendant argued he did not confess his crime to Lee. He alleged that Ott met with Lee prior to interviewing him, leading defendant to suspect the detective "briefed" Lee prior to conducting the recorded interview. Defense counsel confirmed he believed Ott would deny speaking with Lee before the interview, that no other witness would

testify to that conversation, and there was no gap in the recording of Ott's interview with Lee.[13]

To undermine Ott's credibility, defendant sought to present evidence that Ott engaged in similar "briefing" behavior with witnesses in three unrelated investigations. The prosecution reviewed Ott's file to determine whether any information needed to be produced in discovery and found nothing of note. Nevertheless, defendant claimed Ott once urged a fellow officer to sign an affidavit attesting to a witness's positive identification of a suspect, once had been asked to testify in a separate case regarding his deviations from procedure, and once recorded an interview with a suspect, which contained a 45-minute gap. As to the last allegation, the trial court concluded it was irrelevant as the matter settled before trial.

The prosecution objected to defendant's proposed examination regarding these topics on relevance and Evidence Code section 352 grounds as speculative, irrelevant, and prejudicial. The trial court agreed, explaining something more than Lee's uncorroborated "passing statement" that he saw Ott before his recorded interview was needed to impugn Ott's character. The court precluded the proposed cross-examination, reasoning it would be tantamount to introducing instances of misconduct to prove a crime and the jury should not be invited to speculate.

---

[13]    Defense counsel contended there was a gap in the videotape of Ott's interview of defendant, but the prosecution did not intend to introduce that video recording into evidence in the guilt phase.

Defendant argues the trial court's decision violated his confrontation right and prevented his attorney from properly defending him. We disagree. " ' " '[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." ' [Citation.] However, not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. . . . Thus, unless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witnesses'] credibility' [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment." ' " (*People v. Dalton* (2019) 7 Cal.5th 166, 217, citations omitted.)

Defendant argues cross-examining Ott would have revealed a pattern of practice outside the norm for police officers. We disagree. Defendant claimed that because one of Ott's prior interviews with a suspect contained a 45-minute gap in the recording and because Ott was alone with Lee and controlled the audio recording of his interview, he had a practice of manipulating interviews to prepare witnesses. As the trial court concluded, such an argument is little more than rank speculation; indeed, as the trial court explained, Lee told the prosecution that Ott never provided him with information about the case, and there was no gap in the audio recording of Lee's

interview. In the absence of affirmative evidence Ott engaged in any misconduct in this or other cases, the trial court did not abuse its discretion by concluding the probative value of the evidence was outweighed by the consumption of time and potential for confusion. (See *People v. Doolin* (2009) 45 Cal.4th 390, 438–439.)

## I. Lying in Wait

Defendant argues insufficient evidence supported the jury's true finding of the lying-in-wait special circumstance or first degree murder theory, and that the special circumstance, as applied, is unconstitutional.

"[O]ur assessment of defendant's various challenges to the sufficiency of the evidence are well settled. We ' " 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' [Citation.] The same standard applies when examining the sufficiency of the evidence supporting a special circumstance finding." (*People v. Brooks*, *supra*, 3 Cal.5th at p. 57.)

The " 'lying-in-wait special circumstance requires " ' "an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) . . . a surprise attack on an unsuspecting victim from a position of advantage . . . ." ' " ' (*People v. Johnson* (2016) 62 Cal.4th 600, 629 [197 Cal.Rptr.3d 461, 364 P.3d 359] (*Johnson*).) The lying-in-wait special circumstance (Pen. Code, § 190.2, subd. (a)(15)) includes the elements of first degree lying-in-wait murder (*id.*, §

189, subd. (a)) but requires the additional element that the killing was intentional, not merely committed with implied malice. [Citation.] Thus, we focus here on whether substantial evidence supports the special circumstance, for if it does, it necessarily supports the theory of first degree lying-in-wait murder." (*People v. Flinner* (2020) 10 Cal.5th 686, 748.)

Defendant unsuccessfully moved, pursuant to section 995, to set aside the information charging him with Gallego's murder along with the rape-murder, sodomy-murder, and lying-in-wait special circumstances. Defendant argued that there were interruptions between the period of alleged watchful waiting and the commission of lethal acts undermining the lying-in-wait theory, and any efforts he made to conceal his lethal actions after committing them could not support the special circumstance. Defendant now claims insufficient evidence supports his conviction, arguing it is based on scant evidence — namely, that he and Gallego were roommates who could — and did — come and go from their shared living space freely (as, for example, when Gallego went to work on August 10); that he requested time off of work beginning several days before Gallego's last day of work, but that his vacation request did not suggest murderous intent; and that he took steps to conceal the crime after its commission, which did not undermine his assertion that the killing arose from a sudden heat of passion.

Our review is not limited to the selection of facts defendant presents; rather, we consider the whole record. Having done so, we conclude ample evidence supported the special circumstance true finding, and therefore the theory of murder. (*People v. Brooks, supra,* 3 Cal.5th at p. 57.) Defendant concealed his purpose from Gallego and others, gathering Gallego's personal financial information over a period of time to steal her savings.

He watched and waited before acting, as evinced by his taking photographs from Gallego and creating "morphed" images of her face or body combined with images of other women. He requested time off of work for several days and concealed his plans for that time, claiming to be visiting his terminally ill relative. He intended to, and did, plan to mutilate and dispose of Gallego's body, as evinced by the notations on his to-do list to "burn palms + face thoroughly" and reference to a "small hand truck & drawer for extraction from apt." Indeed, the medical examiner noted that Gallego's body showed blackened and wrinkled skin around her hands suggesting post-mortem burning. He methodically planned his attack, which began at least as early as his creation of a to-do list to effectuate the crime, which included steps such as closing the doors and windows of the apartment to avoid any sound escaping.

The crime revealed ample evidence of his concealment of purpose, watching and waiting, and surprise. As to evidence of surprise, the head wound Gallego suffered, the marks on her wrists and back consistent with handcuffing, and her lack of defensive wounds all indicate defendant surprised Gallego before inflicting the injury that killed her. Defendant's concealment of purpose to sexually assault Gallego and his watchful waiting for an opportune time to act were evident in the lengthy list of the sexual acts he drafted to perpetrate against Gallego (which list included items he would need to carry out those acts like a shaver cord); the collaged sexually graphic images of Gallego; and evidence suggesting he carried out his intentions, including the fact that Gallego was found with recently shaved pubic hair.

Viewing this evidence in the light most favorable to the prosecution, we conclude a trier of fact could have concluded

that defendant intentionally killed Gallego following a period of watchful waiting. We need not credit defendant's contrary claims — that several days passed between his last day of work and the last time Gallego was seen, which he alleges undermines the notion of watchful waiting, and that his activities to conceal the murder after committing it suggests it was committed in the heat of passion — because sufficient evidence supports the trier of fact's conclusions. (*People v. Moon* (2005) 37 Cal.4th 1, 22–23 [upholding lying-in-wait special circumstance finding where the defendant concealed his purpose, but not his presence, from the victim before "suddenly push[ing] her down the stairs and then strangl[ing] her"]; see also *People v. Nelson* (2016) 1 Cal.5th 513, 550 (*Nelson*) [special circumstance does not require a defendant " ' " 'be literally concealed from view before he attacks the victim' " ' "].)

Defendant also claims the special circumstance is unconstitutionally vague and overbroad because it fails to narrow the class of death-eligible offenders or provide a basis to meaningfully distinguish between those who are and are not eligible for the death penalty. We have repeatedly rejected this claim, as defendant acknowledges, and defendant presents us with no reason to reconsider our prior conclusion. (*People v. Flinner, supra,* 10 Cal.5th at p. 751; *People v. Johnson, supra,* 62 Cal.4th at pp. 634–637; *People v. Casares* (2016) 62 Cal.4th 808, 849 ["Contrary to defendant's argument, the lying-in-wait special circumstance is not coextensive with either theory of first degree murder"].)

Defendant argues the jury was misled by the lying-in-wait jury instructions and by the prosecution's related opening and closing arguments. We disagree. Before closing arguments, defendant unsuccessfully moved for judgment of acquittal

pursuant to section 1118.1, seeking to dismiss the special circumstance allegation or to alternatively dismiss the murder charge. The trial court noted that the motion in essence argued the lying-in-wait theory was unconstitutionally vague and denied the motion both because it found constitutional infirmity was not an appropriate basis for a section 1118.1 challenge, and because ample evidence supported the lying-in-wait special circumstance allegation and theory of murder.

The jury was instructed with CALJIC No. 8.25[14], that murder by means of lying in wait requires watching and waiting, taking the victim by surprise whether or not they are "aware of the murderer's presence," and time enough to premeditate and deliberate. The jury was instructed that the special circumstance required a premediated, deliberate killing

---

[14]  The jury was instructed as follows: "Murder which is immediately preceded by lying in wait is murder of the first degree. This is a separate theory of first degree murder. [¶] The term 'lying in wait' is defined as awaiting and watching for an opportune time to act, together with a concealment by ambush or some other discrete design to take the other person by surprise even though the victim is aware of the murderer's presence. [¶] The lying in wait need not continue for any particular period of time provided that its duration is such to show a state of mind equivalent to premeditation or deliberation. [¶] The word 'premeditation,' as I've instructed you previously, means considering beforehand, and the word 'deliberation' means formed or arrived at or determined upon as a result of careful thought and the weighing of considerations for and against the proposed course of action."

"by means of lying in wait."[15]   In her opening statement, the prosecutor argued, "[D]efendant is not only guilty of murder, but he's guilty of slowly and methodically planning this crime, which is to take Patricia Gallego by surprise, which is lying in wait. He did this in order to rape her, and he did this in order to get all her money."   In closing argument, she told the jury it could find the lying-in-wait special circumstance and theory of murder true whether or not Gallego knew defendant was present in their apartment and explained that no particular duration of waiting needed to have been established.

Defendant argues the instructions amounted to a "constitutionally intolerable" violation of his state and federal due process rights because the prosecution was not required to prove the requisite mental state for first degree murder.   That is, he claims the lying-in-wait special circumstance and theory of murder "amount[ed] to strict liability for [his] being present prior to the offense, in the apartment that he shared with the

---

[15]   The jury was instructed on the special circumstance as follows:  "To find that the special circumstance referred to in these instructions as murder by means of lying in wait is true, each of the following facts must be proved: [¶] . . . [¶] One, the defendant intentionally killed the victim; [¶] And, two, the murder was committed by means of lying in wait. [¶] Murder which is immediately preceded by lying in wait is a murder committed by means of lying in wait. [¶] And the term 'lying in wait' is defined as awaiting and watching for an opportune time to act, together with a concealment by ambush or some other secret design to take the other person by surprise, even though the victim[ is] aware of the murderer's presence. [¶] The lying in wait need not continue for any particular period of time, provided that its duration is such as to show a state of mind equivalent to premeditation and deliberation. [¶] The words 'premeditation' and 'deliberation' have been defined for you previously."

victim." This contention lacks merit. " 'We have repeatedly held that CALJIC No. 8.25 adequately conveys to a jury the elements of lying-in-wait murder.' " (*People v. Duong* (2020) 10 Cal.5th 36, 68, quoting *People v. Russell* (2010) 50 Cal.4th 1228, 1244.) One of those elements includes watchful waiting for a period of time sufficient "to show a state of mind equivalent to premeditation or deliberation." (CALJIC No. 8.25.) We have also held that "CALJIC No. 8.81.15 is not by its length or terms ' "impossible to understand and apply." ' " (*People v. Cage* (2015) 62 Cal.4th 256, 281.) "It is not internally inconsistent in its treatment of the temporal element of lying in wait, which properly references the concepts of premeditation and deliberation." (*Ibid*.) Moreover, "the use of the same language in both CALJIC No. 8.81.15 and CALJIC No. 8.25 concerning the period of time necessary for lying in wait is appropriate. The difference between lying-in-wait murder and the lying-in-wait special circumstance does 'not touch on th[is] durational element of lying in wait.' [Citations.] The difference lies in the required mental states . . . ." (*Ibid*.) We recently affirmed that the difference between the special circumstance of lying in wait and " ' "ordinary" premeditated murder' " is not simply intent, but also the "elements of concealment, watching and waiting, and a surprise attack from a position of advantage." (*People v. Flinner*, *supra*, 10 Cal.5th at p. 752; see *People v. Sandoval* (2015) 62 Cal.4th 394, 416.) Accordingly, we conclude defendant's contentions that the prosecution was improperly relieved of its burden of proof and the jury was inadequately instructed on the requisite mental state are meritless. To the extent defendant challenges the trial court's denial of his section 1118.1 motion, we conclude defendant's claim lacks merit. Such denials are reviewed "using the same standard 'employed in

reviewing the sufficiency of the evidence to support a conviction,' " and we conclude that ample evidence supported the trier of fact's conclusion. (*People v. Veamatahau* (2020) 9 Cal.5th 16, 35, quoting *People v. Houston* (2012) 54 Cal.4th 1186, 1215.)

## J. Financial Gain Special Circumstance

Defendant argues insufficient evidence supported the jury's true finding on the financial gain special circumstance. As noted above, we review these challenges for " ' " 'substantial evidence — that is, evidence which is reasonable, credible, and of solid value.' " ' " (*People v. Brooks*, *supra*, 3 Cal.5th at p. 57.) Before Gallego's death, defendant told Powell he planned to enter into a deal with Gallego to marry her in exchange for money. Defendant left both Ijames and Powell with the impression that the planned marriage was transactional in nature. Two days after Gallego was last seen, defendant cashed a $300 check written from Gallego to him. Two days after that, on the day Gallego's body was found, defendant attempted to cash a $350 check written from Gallego to defendant, but he was unable to do so because of an error at the bank. The next day, defendant successfully transferred the entire balance of Gallego's savings, $4,670.02, into his checking account. Defendant had written down all of Gallego's personal identifying and financial information, which he concedes he used to submit credit card applications in her name, or variations thereof. Following his arrest, defendant told Lee, his county jail cellmate, that Gallego would have paid him $2,000 to marry her for citizenship, but defendant determined he would profit to a greater degree by killing her and obtaining her savings (which he thought to be between $12,000 and $15,000).

The evidence was sufficient to support the jury's finding true the financial gain special circumstance. "Under section 190.2, subdivision (a)(1), a defendant is subject to the special circumstance if the 'murder was intentional and carried out for financial gain.' " (*People v. Fayed* (2020) 9 Cal.5th 147, 201.) The financial gain does not need to be the " ' "dominant," "substantial," or "significant" motive for the murder.' " (*People v. Sapp* (2003) 31 Cal.4th 240, 282; see also *People v. Michaels* (2002) 28 Cal.4th 486, 519 [financial gain may be "secondary purpose" of murder].) Nor does a defendant need to realize any "pecuniary benefit from the murder" for the special circumstance to apply. (*People v. Sapp*, at p. 282.) " ' "[T]he relevant inquiry is whether the defendant committed the murder in the expectation that he would thereby obtain the desired financial gain." ' " (*Ibid*.)

Here, defendant acknowledged that he believed he would receive greater financial benefit from killing Gallego than marrying her. In the immediate aftermath of her disappearance, he transferred Gallego's savings into his bank account and deposited checks from her account into his. This conduct suffices to establish defendant's expectation of financial gain. (See *People v. Crew* (2003) 31 Cal.4th 822, 851 [a reasonable jury could find that the defendant killed the victim with an expectation of financial gain when victim closed out her account and defendant deposited a portion into his own account].)[16]

---

[16] Because defendant was not charged with an overlapping financial special circumstance, a "limiting construction of the financial-gain special circumstance" is not applicable. (*People v.*

Defendant's reliance on *People v. Adcox* (1988) 47 Cal.3d 207 is misplaced. There, we held the financial gain special circumstance inapplicable to murder that took place during the course of robbery of the victim's wallet and car. (*Id.* at p. 246.) Defendant argues the crime he committed was more like robbery than murder for hire. But a jury need not find a defendant committed murder for hire to conclude the primary or secondary purpose of murder was financial gain. Here, where defendant told his cellmate following his arrest that he intended to kill Gallego to steal all her money rather than accept a smaller amount as payment in exchange for marrying her, he called her bank for several days prior to murdering her to check her bank balance, and then he methodically transferred funds from her account to his after killing her, we conclude there was sufficient evidence to support the finding that the murder was committed with the " ' "expectation that he would thereby obtain the desired financial gain." ' " (*People v. Sapp, supra*, 31 Cal.4th at p. 282.)

## K. Alleged Instructional Error

### 1. *Prosecution's Burden To Prove Charges Beyond a Reasonable Doubt*

Defendant contends that instructing the jury with CALJIC No. 2.90, along with four related instructions, undermined the constitutional requirement of proof beyond a reasonable doubt. He acknowledges we have consistently

---

*Crew, supra*, 31 Cal.4th at p. 850; accord *People v. Howard* (1988) 44 Cal.3d 375, 409.)

concluded CALJIC No. 2.90[17] suffers from no constitutional defect but urges without elaboration that his claim is distinct from those raised in other cases.

Defendant correctly notes that proof beyond a reasonable doubt is constitutionally required to sustain a criminal conviction. (See *In re Winship* (1970) 397 U.S. 358, 361–364 [holding that the due process clause protects defendants by requiring proof beyond a reasonable doubt].) The federal Constitution " 'does not require that any particular form of words be used in advising the jury of the government's burden of proof.' " (*People v. Potts* (2019) 6 Cal.5th 1012, 1032.) Rather, it requires that " ' "taken as a whole, the instructions . . . correctly conve[y] the concept of reasonable doubt to the jury." ' " (*Id.* at p. 1033.)

We have held CALJIC No. 2.90 "establishes the prosecution's burden of establishing the defendant's guilt 'beyond a reasonable doubt.' " (*People v. Ghobrial, supra,* 5 Cal.5th at p. 286.) The instruction is not confusing or misleading, as defendant urges us to conclude. (*People v.*

---

[17] The jury was instructed, "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in a case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the State the burden of proving him guilty beyond a reasonable doubt. [¶] Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge." (See CALJIC No. 2.90.)

*Lucas* (2014) 60 Cal.4th 153, 296.) Nor do we find that CALJIC Nos. 2.01, 2.02, 8.83, or 8.83.1 undermined the requirement of proof beyond a reasonable doubt. (*People v. Dalton, supra,* 7 Cal.5th at p. 263 [rejecting the defendant's argument that those four instructions diluted the constitutional requirement of proof beyond a reasonable doubt].) We have repeatedly rejected the argument that the phrase, "appears reasonable," in the instructions misleads jurors, and defendant advances no persuasive reason to reconsider our prior holdings. (*Ibid.*; see also *Nelson, supra,* 1 Cal.5th at pp. 553–554 [rejecting similar challenges to CALJIC Nos. 2.01, 2.02, 8.83 and 8.83.1].) Accordingly, we conclude CALJIC No. 2.90 and related instructions did not undermine the requirement of proof beyond a reasonable doubt.

### 2. *Modification of CALJIC No. 2.70*

Defendant contends the trial court erred by refusing to modify CALJIC No. 2.70 to eliminate references to "confession" in the instruction. Specifically, he claims that statements he made to a fellow inmate in county jail were admissions and refusing to remove the definition of confession from the instruction permitted the jury to improperly construe defendant's statements as confessions, rather than mere admissions. This argument lacks merit.

Lee testified that defendant told him that he was in jail for killing a Brazilian woman. Defendant told Lee details of the crime, including that he drained the victim's blood, tried to disguise her identity by cutting off her fingers with bolt cutters, and transported her body to Carlsbad in a truck, where he was startled by a bright light when dumping the body. Defendant told Lee that he initially planned to marry the victim so she

could become a citizen in exchange for $2,000, but after learning she had around $12,000 or $14,000 in the bank, defendant explained to Lee, "he figured why get the 2- when he could do another thing and get it all, you know." Lee testified that by "do another thing," defendant meant that he planned to "get rid of" his victim.

Defense counsel requested CALJIC No. 2.70 — which defined an admission and confession — be modified to remove the paragraph defining confession. Counsel argued that determining whether defendant's statements to Lee constituted an admission or confession was an issue to be decided by the jury. The trial court declined to alter the instruction, noting that "if [it] had some basis to conclude that this wasn't a confession," modification would be warranted. "But," the court went on, "it looks like he pretty much confessed to everything. Homicide, planning, motive, intent." Accordingly, the jury was instructed pursuant to an unmodified CALJIC No. 2.70.[18]

---

[18] In full, as given, CALJIC No. 2.70 provides: "A confession is a statement made by a defendant in which he has acknowledged his guilt of the crime for which he is on trial. In order to constitute a confession, the statement must acknowledge participation in the crime as well as the required criminal intent or state of mind. [¶] An admission is a statement made by a defendant which does not by itself acknowledge his guilt of the crime for which the defendant is on trial, but which statement tends to prove his guilt when considered with the rest of the evidence. [¶] You are the exclusive judges as to whether the defendant made a confession or an admission, and if so, whether that statement is true in whole or in part. [¶] Evidence of an oral confession or an oral admission of the defendant not made in court should be viewed with caution."

Defendant claims that because his statements to Lee were admissions not confessions, the trial court's refusal to modify CALJIC No. 2.70 was error. "We review a claim of instructional error de novo." (*People v. Rivera* (2019) 7 Cal.5th 306, 326.) A trial court "is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request." (*People v. Blair* (2005) 36 Cal.4th 686, 744.) " ' "On review even if an erroneous instruction is included reversal is required only when it appears the error was likely to have misled the jury." ' " (*Nelson*, *supra*, 1 Cal.5th at p. 546.)

In *Nelson*, we held that no error flowed from the trial court's inclusion of the "confession" language when instructing the jury pursuant to CALJIC No. 2.70, although the trial court acknowledged in that case that no confession was made. (*Nelson*, *supra*, 1 Cal.5th at p. 546.) There, the trial court reasoned that instructions on both admissions and confessions "would clarify the distinction between them so that the jurors would not 'talk[] about confessions [when] really all they are talking about is admissions.' " (*Ibid.*) We held there was no reasonable likelihood the jury was misled by the instruction, even assuming it should not have been given. (*Id.* at p. 547.) Here, there is little ambiguity that defendant confessed. Defendant told Lee his financial motive for killing the victim and provided unusual details about the crime, including the fact that he drained all Gallego's blood and removed her fingertips with bolt cutters. No opportunity for confusion arose from giving an unmodified version of CALJIC No. 2.70. Even if defendant is correct that his statement to Lee was an admission and not a confession, the jury was free to make that determination. As we concluded in *Nelson*, reversal is not

warranted because any error would have been unlikely to have misled the jury. (*Nelson*, at p. 547.)

Defendant also argues that by instructing the jury pursuant to an unmodified CALJIC No. 2.70, the court implied to the jury that there was a confession, an implication that impermissibly relieved the prosecution of its burden of proof on a substantive charge. Jury instructions that create a permissive inference, even if erroneous, are unconstitutional only if the inference is irrational. (*People v. Moore* (2011) 51 Cal.4th 1104, 1131–1132.) Even if we assume that CALJIC No. 2.70 permitted the jury to infer defendant confessed to Lee, that inference is sensible, if not compelled, in light of the detail defendant used when describing the murder to Lee, and it did not relieve the prosecution of its burden of proof.

Finally, relying on *Beck v. Alabama* (1980) 447 U.S. 625, defendant claims the alleged instructional error violated his right to a reliable verdict. We have previously rejected this claim, finding "no due process or other federal constitutional error," and defendant presents us with no reason to alter that conclusion here. (*Nelson*, *supra*, 1 Cal.5th at p. 547.)

### 3. *Denial of Defense Instruction on Evidence Tampering*

Defendant argues the trial court's denial of his requested instruction that the prosecution bears the burden of proof that there was no evidence tampering constituted error. Defendant requested the jury be instructed, "The prosecution has the burden of proving to you beyond a reasonable doubt that none of the evidence they have presented was tampered with or contaminated. You may consider any breaks in the chain of custody of any of the evidence collected, transported and

thereafter evaluated in determining whether the prosecution has met their burden."

Defendant claimed there was a break or ambiguity in the chain of custody of the banana peel, scarf, and vaginal swab.[19] Defendant argued his proposed instruction was warranted because Swalwell (a "non-police department scientist") found no spermatozoa on a smear made from a vaginal swab taken from Gallego's body, and Montpetit ("the police department scientist") tested the swab sometime later, finding enough sperm and epithelial cells to conclude defendant and Gallego were "possible" contributors. Defense counsel argued to the trial court that this difference was "an interesting note" and was "something that the jury should consider." The prosecution contended these evidentiary questions were matters for argument, not instruction. Defense counsel also conceded, when pressed by the trial court, that these differing test results did not implicate the chain of custody. Finally, the trial court noted that, contrary to the requested instruction's language, the prosecution's burden was to prove guilt beyond a reasonable doubt, not to prove a lack of evidence tampering or contamination. Defense counsel agreed, suggesting the instruction could be given without the "beyond a reasonable doubt" language. The trial court denied the requested instruction.

Defendant now claims, "[I]t was error to refuse the instruction that would have informed jurors that they must

---

[19] Defendant argued there were questions about the chain of custody of the banana peel and scarf, but aside from this bare assertion, the defense argument and ensuing colloquy were limited to the vaginal swab evidence.

determine that the prosecution showed the chain of custody was intact." " ' " ' "[I]t is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence." ' " ' " (*People v. Wilson* (2021) 11 Cal.5th 259, 295.) "We are 'mindful of the general rule that a trial court may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence.' [Citation.] We review de novo whether instructions correctly state the law." (*People v. Scully* (2021) 11 Cal.5th 542, 592.)

Defendant's claim lacks merit. As the Attorney General argues, the jury was instructed on how to evaluate the scientific experts' testimony pursuant to CALJIC No. 2.80.[20] Moreover, defendant acknowledged the experts' differing test results were unrelated to the chain of custody of the vaginal swab, rendering the requested instruction unsupported by substantial — or any — evidence. Because defendant's requested instruction was

---

[20] The jury was instructed pursuant to CALJIC No. 2.80 as follows: "In determining what weight to give to any opinion expressed by an expert witness, you should consider the . . . believability of the witness as well as the facts or materials upon which each opinion is based and the reasons for each opinion. [¶] An opinion is only as good as the facts and the reasons upon which it's based. If you find that any fact has not been proved or has been disproved, then you must consider that in determining the value of the opinion. Likewise you must consider the strengths and weaknesses of the reasons upon which the opinion is based. [¶] You are not bound by an opinion. You should give each opinion the weight you find that it deserves. You may disregard an opinion if you find it to be unreasonable."

not related to generally relevant legal principles raised by the evidence and because it was duplicative, unsupported by substantial evidence, and misstated the law, we conclude the trial court did not err by refusing to give it.

### 4. CALJIC No. 2.15

Defendant argues his conviction must be reversed because the jury was instructed with CALJIC No. 2.15, and it was not told the instruction was limited to theft-related charges as the use note to the instruction suggested it should be. (See Use Note to CALJIC No. 2.15 (5th ed. 1988) p. 40 ["This instruction will serve to cover the effect of possession of recently stolen property in robbery, burglary, theft and receiving stolen property"].)

Without objection, the jury was instructed with a modified version of CALJIC No. 2.15 as follows: "If you find that a defendant was in possession of recently stolen property, the fact of that possession is not, by itself, sufficient to permit an inference that the defendant is guilty of the crime of murder. [¶] Before guilt may be inferred, there must be corroborating evidence tending to prove defendant's guilt. However, this corroborating evidence need only be slight and need not, by itself, be sufficient to warrant an inference of guilt. [¶] As corroboration, you may consider the attributes of possession, time, place and manner, that the defendant had an opportunity to commit the crime charged, the defendant's conduct and his false statements, if any, and any other evidence which tends to connect the defendant with the crime charged."

Defendant argues that the instruction given without limitation permitted the jury to find him guilty of murder if it found he was in possession of recently stolen property along with some slightly corroborating evidence. As the Attorney General

concedes, we have found the "application of CALJIC No. 2.15 to nontheft offenses like . . . murder . . . erroneous." (*People v. Prieto* (2003) 30 Cal.4th 226, 248–249 (*Prieto*).) This is so because " '[p]roof a defendant was in conscious possession of recently stolen property simply does not lead naturally and logically to the conclusion the defendant committed' . . . murder." (*Id.* at p. 249.)

Defendant claims the error deprived him of his federal constitutional rights because it lessened the state's burden of proof, made it impossible to know whether the jury relied on an incorrect theory of culpability, and permitted the jury to infer the elements of first degree murder from proof defendant possessed stolen property. We have expressly rejected each of these claims. (*People v. Moore*, *supra*, 51 Cal.4th at pp. 1131–1133.)

The instruction did not alter the theory of culpability or affect the propriety of the court's remaining instructions that the jury must be convinced beyond a reasonable doubt that the elements of murder were satisfied. (*People v. Moore*, *supra*, 51 Cal.4th at p. 1131.) Rather, "[t]he jury was instructed it could draw merely 'an inference of guilt' from the fact of possession with slight corroboration, which any rational juror would understand meant he or she could consider this inference in deciding whether the prosecution has established the elements of murder (and the other offenses) elsewhere defined in the trial court's instructions." (*Ibid.*)

The instruction did not "unconstitutionally lower the prosecution's burden of proving each element of the crimes beyond a reasonable doubt: [it] 'did not directly or indirectly address the burden of proof, and nothing in the instruction

absolved the prosecution of its burden of establishing guilt beyond a reasonable doubt.' (*Prieto, supra*, 30 Cal.4th at p. 248.) Other instructions also properly informed the jury of its duty to weigh the evidence, what evidence it may consider, how to weigh that evidence, and the burden of proof. We decline defendant's invitation to reconsider this conclusion." (*People v. Moore, supra*, 51 Cal.4th at p. 1133; see also *People v. Potts, supra*, 6 Cal.5th at pp. 1042–1043.)

Applying the *Watson* standard, we conclude, "[T]here was no reasonable likelihood the jury would have reached a different result if the court had limited the permissive inference described in CALJIC No. 2.15 to theft offenses. (See *Watson, supra*, 46 Cal.2d at p. 836.)" (*Prieto, supra*, 30 Cal.4th at p. 249.) As discussed more fully, *ante* (see Section III.A.2), in light of the overwhelming evidence supporting defendant's conviction, it is not reasonably likely a jury would have reached a different conclusion by merely considering defendant's possession of stolen property and slight corroborating evidence. Accordingly, we find the error harmless. (*Watson, supra*, 46 Cal.2d at p. 836.)

### 5. *Voluntary Manslaughter Instruction*

Defendant argues two voluntary manslaughter instructions, CALJIC Nos. 8.40 and 8.42, improperly permitted jurors to presume murder was the default offense and could be reduced or excused by certain mental states, the presence of which were defendant's burden to prove. Defendant's claim lacks merit. The jury was instructed with CALJIC Nos. 8.40[21]

---

[21] The jury was instructed with CALJIC No. 8.40 as follows: "Defendant is accused in count one of having committed the crime of murder. A lesser-included offense of the crime of

and 8.42,[22] the latter addressing provocation and heat of passion. Before the court agreed to give these instructions, it

---

murder is involuntary manslaughter. [¶] Every person who unlawfully kills another human being without malice aforethought but either with an intent to kill, or in conscious disregard for human life, is guilty of voluntary manslaughter in violation of Penal Code section 192, subdivision (a). [¶] 'Conscious disregard for life,' as used in this instruction, means that a killing results from the doing of an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his or her conduct endangers the life of another and who acts with conscious disregard for life. [¶] In order to prove this crime, each of the following elements must be proved: [¶] 1. A human being was killed; [¶] 2. The killing was unlawful; and [¶] 3. The perpetrator of the killing either intended to kill the alleged victim or acted in conscious disregard for life; and [¶] 4. The perpetrator's conduct resulted in the unlawful killing."

[22] The jury was instructed with CALJIC No. 8.42 as follows: "To reduce an unlawful killing from murder to manslaughter upon the ground of sudden quarrel or heat of passion, the provocation must be of the character and degree as naturally would excite and arouse the passion, and the assailant must act under the influence of that sudden quarrel or heat of passion. [¶] The heat of passion which will reduce a homicide to manslaughter must be such a passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same circumstances. A defendant is not permitted to set up his own standard of conduct and to justify or excuse himself because his passions were aroused unless the circumstances in which the defendant was placed and the facts that confronted him were such as also would have aroused the passion of the ordinarily reasonable person faced with the same situation. Legally adequate provocation may occur in a short, or over a considerable, period of time. [¶] The question to be answered is whether or not, at the time of the killing, the reason of the

had a lengthy colloquy with the parties about whether the brewing discord between Gallego and defendant regarding defendant's unreturned affection for Gallego could constitute provocation. The court ultimately concluded it would give all of the voluntary manslaughter instructions, including CALJIC Nos. 8.37, 8.40, 8.42, 8.43, 8.44, and 8.50. Defendant never objected to any of these instructions on the bases he now asserts: that they rendered the crime of murder a default offense or altered the burden of proof. Accordingly, his appellate challenge is forfeited. (See *People v. Buenrostro* (2018) 6 Cal.5th 367, 391.)

Even if it had been preserved, we conclude his claim lacks merit. Defendant cites no authority supporting his assertion that instructing the jury with two of the standard voluntary manslaughter instructions conflicted with other instructions, misled the jury regarding who bore the burden of proof, or suggested to the jury that murder was a default offense. We have upheld the propriety of both instructions and are presented with no reason to do otherwise here. (See *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144.) As the Attorney General aptly points out, the jury was instructed that the prosecution bore the burden of proof pursuant to CALJIC No. 8.50. Nothing in

---

accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from passion rather than from judgment. [¶] If there was provocation, whether of short or long duration, but of a nature not normally sufficient to arouse passion, or if sufficient time elapsed between the provocation and the fatal blow for passion to subside and reason to return, and if an unlawful killing of a human being followed the provocation and had all the elements of murder, as I have defined it, the mere fact of slight or remote provocation will not reduce the offense to manslaughter."

CALJIC Nos. 8.40 or 8.42 altered this mandate. Jurors are presumed to follow the instructions given. (See *People v. Silveria and Travis* (2020) 10 Cal.5th 195, 309.) We presume the jury did so and conclude the trial court did not err, under state or federal constitutional standards, by giving CALJIC Nos. 8.40 and 8.42 without modification. (*Watson, supra*, 46 Cal.2d at p. 836; *Chapman v. California, supra*, 386 U.S. at p. 24.) We likewise conclude there was no prosecutorial misconduct. Defendant did not object to either instruction on those grounds, and it is not clear that an admonition would not have cured any alleged harm. (See *People v. Valdez* (2004) 32 Cal.4th 73, 122 ["To be cognizable on appeal, a defendant ' "must make a timely objection at trial and request an admonition; otherwise, the [claim of prosecutorial misconduct] is reviewable only if an admonition would not have cured the harm caused by the misconduct" ' "].)

## L. Alleged Prosecutorial Misconduct During the Guilt Phase

Defendant argues several instances of prosecutorial misconduct occurred during the guilt phase of his trial, violating his right to due process and rendering the proceedings fundamentally unfair. We reject these claims.

" 'A defendant's conviction will not be reversed for prosecutorial misconduct . . . unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.' " (*People v. Flores* (2020) 9 Cal.5th 371, 403, quoting *People v. Crew, supra,* 31 Cal.4th at p. 839.) " 'A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the

trier of fact.' " (*People v. Maciel* (2013) 57 Cal.4th 482, 541, quoting *People v. Avila* (2009) 46 Cal.4th 680, 711.)   During opening and closing arguments, the prosecution is given wide latitude to make " 'fair comment on the evidence, including reasonable inferences or deductions to be drawn from it.' " (*People v. Collins* (2010) 49 Cal.4th 175, 213.)   " 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion — and on the same ground — the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*People v. Silveria and Travis, supra*, 10 Cal.5th at p. 306; see also *People v. Flores, supra*, 9 Cal.5th at p. 403).   Defendant alleges numerous instances of prosecutorial misconduct occurred throughout the guilt phase of his trial, but we find none.

### 1. Opening Statement

Defendant claims the prosecutor committed misconduct during the opening statement by improperly arguing about the victim's blood loss, use of a gag, and torture.  He also claims the prosecutor's argument that defendant was guilty of lying in wait was improper.

Defendant's claim lacks merit.  " '[R]emarks made in an opening statement cannot be charged as misconduct unless the evidence referred to by the prosecutor "was 'so patently inadmissible as to charge the prosecutor with knowledge that it could never be admitted.' " ' " (*People v. Dykes* (2009) 46 Cal.4th 731, 762.)   Defendant argued the prosecutor committed misconduct by urging the jury to conclude that, after reviewing all of the evidence, it should find that defendant was not only guilty of murder, but also of "slowly and methodically planning

this crime, which is to take [the victim] by surprise, which is lying in wait." This remark was drawn from the evidence and constituted no more than a preview of the prosecution's theory of the case.

None of the prosecution's relatively few specific references to draining blood, gagging, or torture constituted misconduct. The prosecution's descriptions of Gallego being "drained" of her blood were reasonably supported by admissible evidence. No blood was found in or on Gallego's body, nor was there blood in the trash can within which she was found. The medical examiner testified the cause of death was severance of her jugular vein, which would have caused Gallego to bleed to death. The medical examiner further opined that since no blood was found in Gallego's body, it was possible that defendant submerged Gallego's body in water to allow the blood to flow out. Moreover, defendant confessed to his cellmate that he had killed his roommate and drained the woman's blood in the bathroom. There was ample evidence to support the prosecution's argument that Gallego's blood had been drained from her body, and the prosecutor's references to that argument in her opening statement therefore did not constitute misconduct. (*People v. Flores*, *supra*, 9 Cal.5th at p. 404.)

Ample evidence also supported the prosecution's theory that Gallego was gagged. Gallego's body was completely naked, except for a scarf loosely looped and knotted around her neck. The trial court noted that it had never seen that style of knot used for fashion and believed that the prosecution could make a legitimate inference that Gallego had been gagged. Hergenroeather testified the scarf had been wrapped around

Gallego's neck several times and covered the cut.[23]   The investigators on the case did not believe that the scarf was used to disguise the small wound on Gallego's neck, particularly because the rest of Gallego's wounds remained visible and uncovered on her body.   Just as the evidence supported prosecution's use of the word "drained," so too did the evidence support the use of the word the word "gagged" in the prosecutor's opening statement.  (*People v. Flores*, *supra*, 9 Cal.5th at p. 404.)

The prosecutor's single, colloquial use of the word torture in her opening statement — "The defendant raped and inflicted an enormous amount of pain and torture upon Miss Gallego" — did not constitute misconduct.  The trial court ruled such a use was permissible, and even if the term was inflammatory, a single reference to it was not patently inadmissible, nor would it have altered the result of defendant's trial.  (*People v. Foster* (2010) 50 Cal.4th 1301, 1350 ["in light of our conclusion that the trial court did not abuse its discretion in admitting [the] evidence, the prosecutor's reference to the evidence during his opening statement was not misconduct"]; see also *People v. Dykes*, *supra*, 46 Cal.4th at p. 762; *People v. Flores*, *supra*, 9 Cal.5th at p. 403.)  Because the terms defendant objects to were "within the 'broad scope of permissible argument,'" they did not constitute misconduct.  (*People v. Dykes*, *supra*, at p. 762.)

To the extent defendant also alleges his state and federal constitutional rights were violated when the trial court did not require that the prosecutor generally refrain from using the

---

[23]   As Hergenroeather was about to testify as to his belief regarding the use of the scarf, an objection was interposed and sustained.

words "drained," "gagged," and "tortured" during the opening statement as defendant requested, we find no error. Information about the manner the crime was committed — including that the victim may have been subdued by a gag or handcuffs and that her blood was drained — may have been an evocative description but was not unduly inflammatory and did not alter the burden of proof. We conclude the trial court's denial of defendant's motion to preclude use of certain terms in the opening statement was not erroneous.

### 2. Introduction of Evidence

Defendant alleges the prosecutor committed misconduct by introducing certain photographic, physical, and expert evidence. Specifically, he claims the prosecutor committed misconduct by: introducing sexually graphic images and referring to those images as "porn" or "pornography"; relying on its expert, a forensic dentist; agreeing to appear and discuss defendant's case on a reality television show; introducing allegedly "gruesome" images depicting the victim's postmortem body in "an effort to urge jurors to *ignore* the defense of heat of passion"; introducing evidence of a sperm cell on a banana peel; introducing a photograph depicting the victim in life with her dog; and showing the jury photographs of the victim's postmortem handcuffed body during Powell's testimony.

"When a claim of misconduct is based on remarks to the jury, we consider whether there is a reasonable likelihood the jury construed the remarks in an improper fashion." (*People v. Steskal* (2021) 11 Cal.5th 332, 350, citing *People v. Gonzales* (2012) 54 Cal.4th 1234, 1275.) Defendant argues the prosecution's introduction of sexually graphic evidence constituted misconduct and claims referring to those images as

"porn" or "pornography" was inflammatory. Defendant's claim lacks merit. It is not reasonably likely the jury improperly construed the prosecution's use of the word "pornography" to describe sexually graphic images, as that word is the generally understood term for such images, as is the shortened colloquialism, "porn." To the extent defendant's objection is to the introduction of this relevant and admissible evidence, we conclude no misconduct occurred. Reliance on evidence to prove its case is the function of prosecution and does not constitute the prosecution's use of " ' "deceptive or reprehensible methods to persuade the jury." ' " (*People v. Steskal*, at p. 350, quoting *People v. Friend* (2009) 47 Cal.4th 1, 29.)

We also reject defendant's contention that the prosecution committed misconduct by relying on Sperber's testimony, whom defendant characterizes as a "thoroughly unqualified 'expert,' " because the reliance was not a deceptive or reprehensible tool of persuasion but was instead the ordinary introduction of expert evidence. (See *People v. Steskal*, *supra*, 11 Cal.5th at p. 350.) As described above, the trial court did not abuse its discretion by admitting the testimony, and no misconduct resulted from relying on it. (See *People v. Morales*, *supra*, 10 Cal.5th at p. 97; see also *People v. Foster*, *supra*, 50 Cal.4th at p. 1350.)

Similarly, the prosecution's use of photographs and physical evidence was not deceptive, reprehensible, or " ' "so egregious that it infect[ed] the trial with such unfairness as to make the conviction a denial of due process." ' " (*People v. Kennedy* (2005) 36 Cal.4th 595, 618.) In *People v. Kennedy*, the defendant claimed on appeal the introduction of a photograph of his tattoos constituted prosecutorial misconduct, which claim we rejected in part because defendant introduced the photograph. (*Id.* at p. 619.) We also concluded the prosecution's

mentioning the photograph in closing argument did not constitute misconduct because the evidence was relevant. (*Ibid*.) We conclude likewise here; the photographic and physical evidence — the photo of Gallego in life with her dog, the autopsy photos, the photo shown to the jury during Powell's testimony, and the sperm cell evidence — was relevant, and the prosecution's introduction of it and reliance upon it did not constitute misconduct. Because the trial court concluded the sexually graphic images were relevant and admissible, the prosecutor did not commit misconduct by relying on them. (See *People v. Hawthorne* (2009) 46 Cal.4th 67, 98 [" ' "merely eliciting evidence is not misconduct" ' "].)

Finally, as defendant acknowledges, he is unable to demonstrate he suffered prejudice as a result of the prosecutor's agreement to be depicted in a reality television show about his case that never aired; having viewed the sealed footage, we conclude no misconduct occurred. (See *People v. Steskal*, *supra*, 11 Cal.5th at pp. 353–354.)

Beyond his arguments as to admissibility, which we have rejected, defendant fails to explain how an advocate's use of relevant evidence, admitted by the court through a proper exercise of its discretion, could constitute misconduct.

### 3. *Facts Not in Evidence*

Defendant asserts that the prosecutor committed misconduct by eliciting testimony from Hergenroeather that Gallego had been gagged. Prior to his testimony, the court had ruled Hergenroeather's opinion was inadmissible, cutting off Hergenroeather's testimony before he could finish testifying that he believed Gallego had been gagged. While questioning Hergenroeather about his process of gathering evidence and

presenting it to the district attorney, Hergenroeather testified that he "believed [Gallego] was gagged." The detective explained that during the initial investigation, it was his process to report only facts, not impressions, in his notes, but after a suspect is identified and the case is presented to the district attorney, the detective at that point shares his "thoughts and impressions of the case," which in this instance included his belief she was handcuffed and gagged.

No objection was interposed in response to Hergenroeather's statement, but later during his testimony, defendant objected to an unrelated line of questioning. A sidebar discussion followed, and the court reminded the parties it had previously ruled that evidence concerning the detective's belief regarding why the scarf was looped around Gallego's neck constituted improper opinion evidence. The court concluded the testimony the detective had just given that he believed Gallego had been gagged "came in . . . too fast for" the court and the defense to note or interpose an objection. In light of the speed and passing nature of Hergenroeather's testimony, the court allowed the parties to decide whether it should raise the issue to "unring the bell" by admonishing the jury to disregard the testimony or let it be. Defense counsel argued the jury was attentively listening and writing during the detective's testimony, and the court needed to admonish the jury immediately upon resumption of proceedings. The court agreed it would do so by explaining to the jury the question and answer came too fast for it to sustain any objection, it had previously ruled the detective's opinion about whether the victim had been gagged was not admissible, and it would strike the testimony he had just given on that topic. The court admonished the jury as indicated.

Although defendant did not object to the prosecutor's question or Hergenroeather's testimony on any grounds, it is not clear whether this claim is forfeited because the trial court acknowledged the testimony was given too quickly for an objection to be interposed.[24]  (See *People v. Flores*, *supra*, 9 Cal.5th at p. 403.)  In any event, we conclude the prosecution's brief question, "And what were your thoughts and impressions as to whether Miss Gallego was gagged?" did not constitute misconduct.

" '[A]lthough it is misconduct for a prosecutor *intentionally* to elicit inadmissible testimony [citation], merely eliciting evidence is not misconduct.' "  (*People v. Fuiava* (2012) 53 Cal.4th 622, 679.)  During examination by the prosecution, just as Hergenroeather was about to complete a sentence indicating his belief the scarf tied loosely around the victim's neck may have been used as a gag, the court sustained a defense objection as to what the detective was about to say.  The trial court merely stated that the objection was sustained "as to what [Hergenroeather] was about to say.  I'm not striking anything he's already said."  The court did not elaborate, on or off the record, on its ruling.  The prosecutor explained that she remembered, incorrectly, that defense counsel had subsequently asked Hergenroeather his opinion about whether Gallego had been gagged, but that question was not posed.  The prosecutor apologized to the court for mistakenly believing it could elicit testimony concerning whether the victim was gagged,

---

[24]    At this juncture, the court urged defense counsel to be more attentive and interpose objections more frequently to avoid testimony inadvertently being given that the court had disallowed previously.

misremembering defense counsel's examination, and misunderstanding the nature of the court's ruling excluding the opinion testimony Hergenroeather had been about to give. The court urged the parties to raise evidentiary arguments outside the presence of the jury, and the prosecutor promised to do so.

The prosecutor's question to Hergenroeather does not appear to be an effort to elicit inadmissible testimony; it seems instead a reasonable, if mistaken, effort to elicit admissible evidence. (*People v. Fuiava, supra*, 53 Cal.4th at p. 679.) In any event, the court admonished the jury to disregard Hergenroeather's testimony, and defendant fails to demonstrate that this remedy was inadequate. (See *People v. Tully, supra*, 54 Cal.4th at pp. 1037–1038 [defendant's nonspecific objection to alleged prosecutorial misconduct sustained].)

### 4. *Jailhouse Informant Evidence*

Defendant claims the prosecution committed misconduct by introducing Lee's testimony because, he claims, there were doubts concerning its veracity. He also alleges, "[T]he prosecutor's insistence on not permitting jurors to consider Det[ective] Ott's pattern and practice of misconduct in other cases" constituted misconduct. The trial court heard extensive argument regarding the propriety of introducing evidence of Ott's alleged wrongdoing and ultimately ruled it was irrelevant because there was no evidence that Ott acted improperly in the instant case. We conclude the prosecutor committed no misconduct either by eliciting Lee's testimony or by not presenting evidence of Ott's alleged misconduct in other cases, in accordance with the court's ruling. (See *People v. Fuiava, supra*, 53 Cal.4th at p. 679 [merely eliciting testimony does not constitute prosecutorial misconduct].) As described above, the

trial court admitted much of Lee's testimony, and no misconduct resulted from the prosecutor's reliance on testimony that the trial court had already ruled was properly before the jury. Contrary to defendant's assertion, most of Lee's criminal history was introduced as impeachment evidence, and the trial court's ruling excluding a few dated offenses was not a prosecutorial decision that could have constituted misconduct. Finally, we conclude the prosecutor's failure to elicit testimony of Ott's prior acts in reliance on the court's express ruling that such information was unduly speculative and therefore inadmissible was not misconduct. (See *People v. Foster*, *supra*, 50 Cal.4th at p. 1350.)

### 5. *Closing Argument*

Defendant argues the prosecutor committed misconduct by encouraging jurors to conclude the crime was planned, referring to the sexually graphic "porn" images defendant created and to the sexual fantasies described in defendant's writings. Defendant failed to object to any of these comments, but even if the claim was preserved, we would find no misconduct. We have repeatedly held a prosecutor has " 'wide latitude to draw reasonable inferences from the evidence presented at trial.' " (*People v. Tully*, *supra*, 54 Cal.4th at p. 1022.) Defendant's arguments that it was misconduct for the prosecutor to ask jurors to credit Sperber's expert testimony about tool marks as common sense, testimony that defendant once used handcuffs to lock his bike, evidence the victim's body was drained of blood, and the prosecution's rebuttal arguments that defendant used a gag and handcuffs lack merit; these statements constituted no more than permissible comments on evidence presented during the trial. (*Ibid.*)

Although a prosecutor commits misconduct by misstating the law (*People v. Fayed, supra,* 9 Cal.5th at p. 204), defendant's claims that it was misconduct for the prosecutor to argue manslaughter means "man's laughter" because it lessened the burden of proof, or to explain the jury need not agree on an underlying theory of first degree murder, are unavailing. The prosecutor did not suggest defendant was laughing at the victim's death; rather, she explained that the root words of manslaughter remind that a finding of manslaughter involves less culpability than first degree murder. While this analogy may have been confusing or inapt, it was not a deceptive or reprehensible method used to persuade the trier of fact, nor did it infect the trial with unfairness sufficient to render the subsequent conviction a denial of due process. (*People v. Silveria and Travis, supra,* 10 Cal.5th at p. 306.) Defendant also argues that jurors need not agree on the theory of first degree murder, allowing the prosecutor to press "many pieces of unreliable information, and theories that were unsupported by reliable facts." Both the "man's laughter" argument and the prosecutor's correct statement that jurors need not agree on the theory of first degree murder did not constitute misconduct. (See, e.g., *People v. Scully, supra,* 11 Cal.5th at p. 593 [jurors need not agree on theory of first degree murder].)

## PENALTY PHASE

### A. Alleged Prosecutorial Misconduct During the Penalty Phase

Defendant alleges the prosecution engaged in a pervasive campaign of misconduct at all phases of his trial. He claims the individual instances and cumulative impact of that misconduct warrant reversal of his death sentence. We conclude no prosecutorial misconduct occurred at the penalty phase.

As addressed previously, a prosecutor enjoys wide latitude during closing argument to comment on the evidence or draw reasonable inferences from it; misconduct arises when the prosecution uses deceptive or reprehensible methods to persuade the trier of fact or infects the trial with unfairness sufficient to render the subsequent conviction a denial of due process. (See *People v. Silveria and Travis*, *supra*, 10 Cal.5th at p. 306.) Defendant argues several comments the prosecutor made during closing argument constituted misconduct. The prosecutor told jurors that the nature of the case "makes us feel bad" in the course of reminding jurors of their duty to persevere. Any claim of misconduct arising from this statement is forfeited because defendant did not object (see *People v. Dykes, supra*, 46 Cal.4th at p. 770), and it lacks merit. The prosecution's comments urged the jury to impose the death penalty in light of the horrific way in which defendant killed Gallego, despite the fact that having to listen to the evidence made them feel "bad" and despite the fact that they "didn't want to be here," which is not outside the realm of proper argument. (*People v. Gamache* (2010) 48 Cal.4th 347, 389.)

Next, defendant argues the prosecutor told jurors they had a duty to impose death by stating they were "called upon to deliver that penalty in this case." The prosecutor also analogized their reaching a verdict to climbing Mount Everest. Defendant failed to object to these statements, thus forfeiting his claim on appeal. (*People v. Dykes, supra*, 46 Cal.4th at p. 773.) Even so, his claims are without merit. Taken in isolation, the prosecutor's analogy might have suggested to the jury that they should see the imposition of the death penalty as the ultimate achievement or something they ought to take pride in. If so, we are doubtful that this would have been a proper

characterization of the jury's solemn duty. However, when read in context, the prosecutor's use of the Mount Everest analogy appears intended as a means of empathizing with the jury over the "struggle" of having to "immerse" themselves in the "horrible murder" of Gallego even after they had already reached a guilty verdict, and reminding the jury that they had a duty to "see this case through to the end." In effect, asking the jury to render an appropriate verdict at the end of a grueling trial is not improper argument. While the Everest statement may have been oblique and overly dramatic, it was not misconduct. (See *People v. Silveria and Travis*, *supra*, 10 Cal.5th at p. 306.)

Next, defendant argues the prosecution improperly asked jurors to imagine themselves in the victim's experiences and "see what she went through in the last moments of her life." Defendant forfeited this challenge by failing to object (*People v. Dykes*, *supra*, 46 Cal.4th at p. 773), and his claims are without merit. (*People v. Jackson* (2009) 45 Cal.4th 662, 692 [A prosecutor does not commit misconduct by asking the jurors to put themselves in the victim's shoes].) "Although it is inappropriate at the *guilt* phase for a prosecutor to appeal to sympathy by inviting the jury to view the case through the victim's eyes [citation], such appeals are entirely appropriate at the *penalty* phase." (*People v. Winbush* (2017) 2 Cal.5th 402, 485.) An appeal to jurors to place themselves in the victim's position is " ' "appropriate at the penalty phase because there 'the jury decides a question the resolution of which turns not only on the facts, but on the jury's moral assessment of those facts as they reflect on whether defendant should be put to death. . . . In this process, one of the most significant considerations is the nature of the underlying crime. [Citation.] Hence assessment of the offense from the victim's viewpoint

would appear germane to the task of sentencing.' " ' " (*Id.* at p. 486.) Defendant argues the prosecutor committed misconduct by likening jurors to the citizens who reported the trash can containing Gallego's body and PetSmart dumpster where her fingers were found, and to the police officers who investigated, because the comparisons improperly reinforced that they had a duty to impose the death penalty. We find no error; the prosecutor invited the jury to perform its duty as the "conscience of the community" and choose the appropriate penalty but did not use this comparison to suggest jurors must impose the death penalty. (*People v. Gamache, supra,* 48 Cal.4th at p. 389.) A prosecutor is free to present closing argument in " 'colorful terms' " so long as any commentary is brief and does not exceed the bounds of propriety. (*People v. Jackson, supra,* 45 Cal.4th at p. 692.)

Defendant further claims that the prosecution improperly argued facts as aggravating factors including defendant's postcrime actions and references to the victim's dog. Defendant's failure to object or to request an admonishment forfeits review of this claim. (*People v. Rogers* (2009) 46 Cal.4th 1136, 1181.) It also lacks merit. Describing what defendant did to the victim's body after her death constitutes comment on evidence that was already before the jury. Additionally, the prosecution referenced defendant's knowledge of the victim's dog to demonstrate how well he knew her. Both arguments constitute the proper exercise of a prosecutor's wide latitude to comment on the evidence. (*People v. Collins, supra,* 49 Cal.4th at p. 213.)

Defendant next contends that the prosecution improperly urged jurors to count aggravating factors. The prosecutor told the jury they only need to find one special circumstance true to

reach a verdict, and "if you have two, that's twice as many." Defendant objected on the basis that the prosecution was giving "arbitrary weight" to the factors. The court addressed the objection, providing a curative instruction that "[t]here is no magical weight assigned to any factor, no arbitrary weight." It encouraged jurors "to look at the factors, decide which ones are applicable and decide what weight is to be assigned to any of them and all of them." To the extent the prosecution erred, the court's instruction cured any prejudice that may have arisen from the prosecution's comments. (*People v. Jackson* (2016) 1 Cal.5th 269, 367.)

Next, defendant argues that the prosecution improperly characterized the evidence in mitigation by referring to it as reverse victimization, arguing defendant's lack of criminal record was an aggravating factor, and suggesting that a history of child abuse should not be used as an excuse. Defendant claimed the prosecution improperly argued evidence of his childhood abuse be discarded, rhetorically asking the jury whether any one of the 80,000 annual victims of child abuse in San Diego could rely on their abuse report should they later commit murder and be subject to the death penalty. The fact that a prosecutor elects to rebut "the defense's mitigating evidence does not mean the prosecutor erred or committed misconduct." "It is not misconduct to argue that 'the evidence lacked the mitigating force the defendant' " hoped it would have. (*People v. Hajek and Vo, supra,* 58 Cal.4th at p. 1239.) "The prosecution ' "has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in . . . ." ' " (*People v. Flores, supra,* 9 Cal.5th at p. 431.) Furthermore, the prosecution is permitted to question whether

a defendant's mitigating evidence carries much weight. (*People v. Gamache, supra*, 48 Cal.4th at p. 390.)

Defendant contends the prosecution improperly argued defendant's lack of remorse could be considered in aggravation by arguing he would not have disposed of Gallego's body in the way he had if he cared for her or her family. The claim is meritless. "Prosecutors are allowed to focus on a defendant's lack of remorse in two ways. First, '[c]onduct or statements at the scene of the crime demonstrating lack of remorse may be consider[ed] in aggravation as a circumstance of the capital crime under section 190.3, factor (a).' [Citations.] Second, '[a] prosecutor may properly comment on a defendant's lack of remorse, as relevant to the question of whether remorse is present as a mitigating circumstance, so long as the prosecutor does not suggest that lack of remorse is an aggravating factor.' " (*People v. Bonilla* (2007) 41 Cal.4th 313, 356; see also *People v. Pollock* (2004) 32 Cal. 4th 1153, 1185.) The prosecutor's reference to defendant's conduct at the scene of the crime was a permissible argument concerning defendant's lack of remorse.

Finally, defendant claims the prosecutor committed misconduct by commenting on his exercise of constitutional rights while Gallego was unable to do likewise. Specifically, the prosecutor argued: "There was no jury for her. There was no judge in that apartment on Benicia Street. There was no bailiff to maintain order. She did not have an attorney go in there and argue for her life to [defendant]." This claim lacks merit. The prosecutor's comments cannot be understood to improperly "urge the jury to return a death verdict *because* defendant exercised his constitutional rights and did not suggest that defendant should be given a greater penalty *because* he had a trial." (*People v. Jackson* (1989) 49 Cal.3d 1170, 1207.) Had the

prosecutor made disparaging references to defendant's exercise of his own constitutional rights, such an argument would have been improper. But here, the prosecutor's statements, though evocative and hyperbolic, did not " 'infect the trial with such unfairness as to render the subsequent conviction a denial of due process.' " (*People v. Silveria and Travis*, *supra*, 10 Cal.5th at p. 306, quoting *People v. Avila*, *supra*, 46 Cal.4th at p. 711.)

Defendant claims that any prosecutorial misconduct that occurred at other points in his trial cumulated, requiring reversal of his penalty. Because we found no misconduct during any proceedings and likewise conclude no misconduct occurred during penalty phase closing argument, we reject defendant's claim that the cumulative effect of prosecutorial misconduct warrants reversal.

## B. CALJIC No. 8.88

Defendant objected to the use of the word "shall" in CALJIC No. 8.88, which — as given — instructed jurors, "If you conclude that the aggravating circumstances are so substantial in comparison to the mitigating circumstances that they warrant death instead of life without parole, you shall return a judgment of death." He claims use of the instruction violated his rights under the federal and state Constitutions because jurors could have mistakenly believed imposition of the death penalty was mandatory.

Defendant raised his concern with use of the word "shall" during a discussion of the penalty phase instructions, and the trial court agreed to ameliorate defendant's concern by adding his requested language that "[t]he death penalty is never mandatory." The jury was instructed with the modified CALJIC No. 8.88. In closing argument, the prosecution explained that

the word "shall" in the instruction meant that jurors could not decide during deliberation that they believed life in prison without the possibility of parole was a sentence worse than death. Defendant argues that use of the word "shall" in the instruction might have misled jurors into believing the death sentence was mandatory, and the prosecutor's statements during penalty phase closing argument increased that possibility.

In *People v. Brown* (1985) 40 Cal.3d 512, we concluded that instructing jurors with "the unadorned language of section 190.3, that the jury 'shall' impose a sentence of death if it concludes that the aggravating circumstances outweigh the mitigating circumstance[]," "could confuse and mislead the jury regarding the manner in which the penalty should be determined." (*People v. Streeter* (2012) 54 Cal.4th 205, 255, 256.) This confusion could arise in one of two ways: either the jury could believe it must mechanically weigh the various factors, or it might misunderstand " 'that our statutory scheme does not require any juror to vote for the death penalty unless, as a result of the weighing process, the juror personally determines that death is the appropriate penalty under all the circumstances.' " (*Id.* at p. 256.)

No danger of either sort of confusion could have arisen here. Unlike in *Brown*, the jury was instructed that "the weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. Each of you are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider." Unlike the concern raised in *Brown*, the jury was not misled into thinking

the weighing process was mechanical, and jurors understood they possessed discretion. (*People v. Streeter, supra*, 54 Cal.4th at p. 256; see also *People v. Carpenter* (1997) 15 Cal.4th 312, 419; *People v. Noguera* (1992) 4 Cal.4th 599, 640.) The jury was instructed that if the aggravating factors were "so substantial" when compared against those in mitigation "that they warrant[ed] death instead of life without parole," jurors "shall" return a death judgment, but — unlike in *Brown* — the jury was also expressly instructed that "[t]he death penalty is never mandatory." This clarification eliminated the concern we addressed in *Brown*, as the jury was instructed that it could find that a death judgment was warranted if it determined the aggravating circumstances were so substantial compared to mitigating circumstances, and also was instructed that imposition of a death sentence was never mandatory.

Defendant's argument that the prosecutor committed misconduct by highlighting the instruction's language in a misleading manner is similarly unavailing. Although in pre-*Brown* cases, i.e., those decided before CALJIC No. 8.88 was revised, it was necessary to examine the entirety of the record including counsel's argument to determine whether the jury could have been misled, we need not do so here to conclude the jury understood imposition of death was not mandatory. (See *People v. Streeter, supra*, 54 Cal.4th at p. 256.) The language of the instruction was not mandatory, and the addition of defendant's requested sentence, that "[t]he death penalty is never mandatory," ensured that was the case here. And if we do examine the record, the prosecutor's closing argument underscores that the jury could not have been misled: The prosecutor explained that the word "shall" in CALJIC No. 8.88 functioned to remind jurors that even if they personally believed

that life without the possibility of parole was a sentence worse than death, they took an oath to uphold the law, which provides otherwise. Thus, if they found aggravating factors outweighed those in mitigation, CALJIC No. 8.88 foreclosed any "debate back in that jury room about which punishment is worse." In this way, the prosecutor did not argue that the language was included in the instruction to render the penalty mandatory. Instead, the prosecutor relied on the instruction to argue to jurors that they took an oath to uphold the law and that even if they personally thought life imprisonment was worse than death, the law viewed death to be the worse penalty.

We conclude no error arose from the jury instruction, and we likewise conclude the prosecution committed no misconduct by highlighting the word "shall" to clarify that death was the harsher penalty. To the extent the prosecutor's brief reference to the instruction engendered any confusion, the trial court's instructions to the jury cured it. (*People v. Winbush*, *supra*, 2 Cal.5th at p. 480 ["For a prosecutor's remarks to constitute misconduct, it must appear reasonably likely in the context of the whole argument and instructions that ' "the jury understood or applied the complained-of comments in an improper or erroneous manner" ' "].)

## C. Issues Arising from Defendant's Handwritten New Trial Motion Alleging Ineffective Assistance of Counsel

Defendant submitted a handwritten document to the court during penalty phase deliberations claiming his attorney was ineffective. The court filed the document, initially under seal and later — at defendant's request — in the public record, along with a second, similar document defendant later submitted. The court construed his first filing as a motion for new trial based on

ineffective assistance of counsel and appointed the alternate public defender's office to investigate whether there was merit to his motion. Defendant now argues the trial court erred by appointing the alternate public defender without relieving trial counsel and by acceding to his request that his documents be publicly filed. We conclude there was no error.

On August 12, 2002, during penalty phase deliberations, defendant submitted a letter to the court complaining that appointed counsel performed inadequately. The jury returned a verdict of death later that day. Defendant's letter was construed as a motion for new trial based on ineffective assistance of counsel, and the court appointed the alternate public defender's office "for the limited purpose of dealing with the . . . new trial issue." The trial court noted there may have been other grounds for a new trial motion but had defendant's motion claiming ineffective assistance of counsel "prove[n] successful, then [he would] go back to square 1. If that [was] unsuccessful, then the public defender would still be free to deal with any other new trial motion issues in due course."

Defendant asked to be given certain discovery and evidentiary materials, and the court denied that request reminding him that the alternate public defender, Mike Dealy, had access to any necessary documents. At one point during Dealy's investigation, defendant complained that it appeared Dealy was more interested in protecting the alternate public defender's office than him. After inquiring whether defendant had more specific complaints and hearing he did not, the court suggested he cooperate with Dealy to avoid being foreclosed in the future from complaining about Dealy's performance. To the extent defendant sought to be heard in lieu of Dealy, the court concluded Dealy was not in a "conflicted situation" as a result of

his representation and denied defendant's request to represent himself. The court provided Dealy with additional time to review materials related to defendant's *Marsden* motions and the entirety of the trial transcripts and other materials.

After doing so, Dealy informed the court he would not be filing a motion for new trial based on ineffective assistance of counsel. Dealy explained the issues to be raised were more appropriately the subjects of appellate or habeas corpus claims, and that he did not want to "jeopardize [defendant's] appeal rights . . . [or] miss anything" by filing a new trial motion. Dealy assured the court he was not backing out of his representation.

Finding Dealy's refusal unusual, the trial court asked to hear from Dealy's supervisor regarding whether the office could not do the work it was appointed to do. Daniel Mangarin, chief trial deputy of the alternate public defender's office, assured the court that Dealy was experienced and capable, and that Dealy's decision not to file a motion for new trial was sound and in his client's best interest. Mangarin explained that the alternate public defender's office had concluded there were no colorable ineffective assistance of counsel issues to raise in such a motion, but Dealy had been reluctant to state as much on the record and potentially impair defendant's ability to raise postconviction claims. The court released the alternate public defender's office from the case, commenting: "What I wanted, and I think what I got, is an independent evaluation of any potential [ineffective assistance of counsel] issues. It appears, at this point, that I've had that not just by one but by two attorneys, two experienced defense attorneys, and they have expressed their professional view that there are no issues properly to be presented at this point."

Following Dealy's release, defendant's sealed, handwritten new trial motion was provided to appointed counsel and was subsequently unsealed and filed at defendant's request. On February 24, 2003, before the hearing on defendant's motion for modification of judgment, defendant submitted a second, lengthy handwritten document, which the court filed under seal and ordered served on all parties. Defendant began reading the document into the record and requested that an unsealed copy of it be made part of the record, which the court granted.

Defendant argues that appointing Dealy for the limited purpose of determining whether appointed trial counsel was ineffective ran afoul of this court's decision in *People v. Sanchez* (2011) 53 Cal.4th 80, 84, in which we explained that if a defendant makes a showing during a *Marsden* hearing that the right to counsel was substantially impaired, "substitute counsel must be appointed as attorney of record for all purposes." *People v. Sanchez* is, as the Attorney General notes, readily distinguishable as here there was no request to substitute counsel. Instead, defendant submitted a handwritten note in which he merely asserted ineffective assistance as a basis for a new trial, and there was no showing that defendant's right to counsel had been substantially impaired. *People v. Clark*, *supra*, 52 Cal.4th at pages 912–915 is instructive although — like *Sanchez* — factually distinguishable from the instant case.

There, in response to a defendant's renewed request to substitute counsel, the trial court "grant[ed the] defendant's request for independent counsel to represent him," even though it had previously denied that request, explaining "it had reversed its earlier ruling 'just to make sure every possible point will be brought forth that legally can be brought forth' on defendant's behalf." (*People v. Clark*, *supra*, 52 Cal.4th at

p. 914.) Guilt phase proceedings continued unabated over the defendant's objection until independent counsel determined a *Marsden* motion was warranted. (*Id.* at pp. 914–915.)

"[W]e reject[ed] defendant's assertion that the court erred when it allowed trial to continue while" the defendant's motion to substitute counsel, which prompted the court to appoint independent counsel "was pending. It is well settled that a court 'must promptly consider a motion for substitution of counsel when the right to effective assistance "would be substantially impaired" if his request were ignored.' [Citations.] Here, however, the record shows that . . . defendant did not seek the discharge of his attorneys but rather requested appointment of independent counsel to assist him in bringing such a motion. Because there was no pending *Marsden* motion, the court did not err in proceeding with trial. (See *People v. Majors* (1998) 18 Cal.4th 385, 411–413 [75 Cal.Rptr.2d 684, 956 P.2d 1137] [the court did not err in failing to conduct a *Marsden* hearing before the penalty phase because no motion was before the court at that time].)" (*People v. Clark*, *supra*, 52 Cal.4th at p. 916.) Similarly here, defendant did not move under *Marsden* for substitution of counsel, and the cessation of proceedings was not warranted.

Defendant argues that the fact that separate counsel was appointed demonstrates defendant had an actual conflict of interest with his trial counsel. He claims the appointment of separate counsel left him without representation as trial counsel continued to bear responsibility for his case while having his integrity attacked, defense counsel's "hands [were] tied in respects that could not fully be explored on the record," and defendant was left to act as his own attorney, submitting motions he claims Dealy should have prepared. This claim lacks

merit. Separate counsel's appointment did not signal an apparent conflict of interest; indeed, his role was to investigate whether there was merit to defendant's contention that a new trial motion based on ineffective assistance of counsel was warranted. Defendant's right to seek new trial on grounds other than ineffective assistance of counsel was not impaired; the court took care to explain any new trial issues defendant's trial counsel wished to raise could be addressed after the alternate public defender's office completed its investigation. And defendant did not act as his own attorney — indeed, when he sought to be heard instead of Dealy, the trial court reminded him that he was represented, and any requests for documents he made of the court directly should instead be conducted via counsel.

Finally, defendant claims that the court erred by filing his handwritten documents because he was represented by counsel, and his pro se statements were written without benefit of his attorney, constituting a deprivation of the right to counsel. Defendant concedes no authority supports his argument, but urges us to conclude the trial court acted unreasonably by acceding to his requests to publicly file the documents. There is no basis to do so. As the Attorney General points out, the trial court made every effort to maintain the documents under seal. Before sentencing, defense counsel advised the documents remain sealed. At defendant's sentencing hearing, counsel explained it had advised defendant he would have an opportunity to address the court and should avail himself of it, noting he did not wish to interfere with defendant's ability to raise issues with counsel's performance. Eventually, after defendant began reading one of his filings aloud — rendering it part of the public record — the court acquiesced to his desire

that the documents be publicly filed. Defendant fails to explain how counsel's representation in this regard was inadequate, nor how the material was covered by the attorney-client privilege. Defendant's claim that the trial court erred by acceding to his request to publicly file the handwritten documents is unavailing.

## D. Motion for New Trial

Defendant claims the trial court improperly denied his motion for a new penalty trial or reduction of his sentence to life without the possibility of parole, alleging the cumulative effect of several erroneous rulings resulted in his sentence. Specifically, defendant claims the trial court erred by allowing the prosecution to introduce numerous photographs of the victim while alive, autopsy photographs of the victim, testimony from one of the victim's friends, rebuttal testimony from Chamberlain, and altered and sexually graphic images shown to her and the jury in connection with her testimony. We find no error.

" ' " ' "We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard." [Citations.] " 'A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion.' " ' " ' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 957.)

The trial court thoughtfully addressed each of defendant's claims. As to the photographs of the victim in life introduced during the penalty phase, the trial court confirmed it would "stand by the rulings" it had made to limit the number of photographs that could be introduced but reasoned the victim

impact evidence was generally "authorized by the U.S. Supreme Court." As to the autopsy photos of the victim and her hands, the court had excluded the "particularly upsetting" images under Evidence Code section 352 at the guilt phase but permitted the images' introduction at the penalty phase as "circumstances of the crime," confirming its continued view that the photos were admissible.

The trial court disagreed with defendant's argument that victim impact testimony must be limited to family members, finding that Gallego's friend, Stepanof, appropriately testified about their relationship and about a thank you note the victim had written to her. Finally, the court confirmed the probative value of Chamberlain's testimony and the introduction of altered, sexually graphic photographs, explaining the evidence was relevant to demonstrate defendant's capacity to "maintain a relatively normal relationship" while engaging in behavior indicative of his "dark side which resulted in his being here in this case."

After addressing each of defendant's arguments, the court clarified its role to independently reweigh the evidence in ruling on a motion to modify the judgment. It did so, explaining its view on each of "the statutory factors, [section 190.3, factors] (A) through (K), and outlining what — which of those factors I believe are important to this decision." It did so at some length, concluding that after "weighing all these factors, all of these, balances [*sic*] the horror and the calculated character of the crime against [defendant's] lack of a prior record and the undeniable darkness of his childhood. . . . that the weight of the evidence supports the jury's verdict." The court did not manifestly or unmistakably abuse its discretion in reaching these conclusions, and we will not upset the ruling on appeal.

(*People v. Hoyt*, *supra*, 8 Cal.5th at p. 957; see *People v. Zamudio* (2008) 43 Cal.4th 327, 365 [video montage of images of victim while alive admissible penalty phase evidence]; *People v. Caro*, *supra*, 7 Cal.5th at p. 502 [no error admitting autopsy photo of victim]; *People v. Pollock*, *supra*, 32 Cal.4th at p. 1181 [no error admitting victim impact evidence from nonfamily member].)

## E. Death Penalty Is Not Arbitrary or Capriciously Imposed

Defendant argues death was arbitrarily and capriciously imposed based on the county in which he was capitally charged, rendering his sentence and confinement unlawful under the Eighth and Fourteenth Amendments to the federal Constitution and under the California Constitution. As defendant acknowledges, we have previously rejected this contention, explaining that " '[a] prosecutor's discretion to select those eligible cases in which the death penalty is sought does not offend the federal or state Constitution.' " (*People v. Silveria and Travis*, *supra*, 10 Cal.5th at p. 327.) "Nor does such discretion 'create a constitutionally impermissible risk of arbitrary outcomes that differ from county to county.' " (*Ibid.*) Defendant unpersuasively argues that unequal charging standards among the state's counties violates *Bush v. Gore* (2000) 531 U.S. 98, but in that case the equal protection challenge was expressly limited to the Florida vote recount process due to that issue's complexity. (*Id.* at p. 109; see also *People v. Clark* (2016) 63 Cal.4th 522, 645 [rejecting contention that *Bush v. Gore* is violated by prosecutorial discretion to determine death-eligible cases.)

### F. Constitutionality of Death Penalty Statute

Defendant raises several challenges to California's death penalty statutory scheme, which, as he concedes, we have previously rejected. We decline his request to reconsider those conclusions, and we do not find persuasive his contention that the challenges, considered in the aggregate, compel a different conclusion.

Section 190.2 is not impermissibly broad. We have held that "California's death penalty law 'adequately narrows the class of murderers subject to the death penalty' and does not violate the Eighth Amendment. [Citation.] Section 190.2, which sets forth the circumstances in which the penalty of death may be imposed, is not impermissibly broad in violation of the Eighth Amendment." (*People v. Lopez* (2018) 5 Cal.5th 339, 370; see also *People v. McDaniel* (2021) 12 Cal.5th 97, 155 (*McDaniel*).) Defendant next claims that his constitutional rights were violated by the arbitrary and capricious nature of section 190.3, factor (a). We also "have repeatedly rejected the claim that section 190.3, factor (a), which requires the jury to consider as evidence in aggravation the circumstances of the capital crime, arbitrarily and capriciously imposes the death penalty under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution." (*People v. Capers* (2019) 7 Cal. 5th 989, 1013; see *McDaniel*, at p. 155.)

Defendant argues the death penalty statutory scheme violates the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution because the jury need not find unanimously or beyond a reasonable doubt that aggravating factors existed or substantially outweighed mitigating factors. " '[T]his court has repeatedly rejected arguments that the federal Constitution

requires the penalty phase jury to make unanimous written findings beyond a reasonable doubt that the aggravating factors exist, that they outweigh the factors in mitigation, and that death is the appropriate penalty.' " (*People v. Steskal*, *supra*, 11 Cal.5th at p. 379; see also *McDaniel*, *supra*, 12 Cal.5th at p. 155.)

"Likewise, we have held that the high court's decision in *Hurst v. Florida* (2016) 577 U.S. 92 . . . does not alter our conclusion under the federal Constitution or under the Sixth Amendment about the burden of proof or unanimity regarding aggravating circumstances, the weighing of aggravating and mitigating circumstances, or the ultimate penalty determination. [Citations.] And we have concluded that *Hurst* does not cause us to reconsider our holdings that imposition of the death penalty does not constitute an increased sentence within the meaning of *Apprendi* [*v. New Jersey* (2000)] 530 U.S. 466, or that the imposition of the death penalty does not require factual findings within the meaning of *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed. 2d 556, 122 S.Ct. 2428]. [Citation] . . . [N]either *Ring* nor *Hurst* decided the standard of proof that applies to the ultimate weighing consideration." (*McDaniel*, *supra*, 12 Cal.5th at pp. 155–156.)

California's death penalty statutory scheme does not categorically forbid intercase proportionality review, nor is such review a constitutionally required safeguard. (*People v. Linton* (2013) 56 Cal.4th 1146, 1215; *People v. Winbush*, *supra*, 2 Cal.5th at p. 490 ["Intercase proportionality review, comparing defendant's case to other murder cases to assess relative culpability, is not required by the due process, equal protection, fair trial, or cruel and unusual punishment clauses of the federal Constitution"].)

The jury's consideration of unadjudicated criminal activity as a factor in aggravation under section 190.3, factor (b) does not violate due process or the Fifth, Sixth, Eighth, or Fourteenth Amendments, or render the death sentence unreliable. (*People v. Spencer* (2018) 5 Cal.5th 642, 695.)

The use of adjectives in the list of mitigation factors, including "extreme" and "substantial," does not prevent the jury's consideration of mitigation in violation of the Fifth, Sixth, Eighth, or Fourteenth Amendments to the United States Constitution. (*People v. Mora and Rangel*, *supra*, 5 Cal.5th at p. 519.)

State law does not require jurors to be instructed that statutory mitigating factors be considered only in mitigation. (*People v. Landry* (2016) 2 Cal.5th 52, 123; *People v. Duff* (2014) 58 Cal.4th 527, 570 [the trial court was not constitutionally required to instruct the jury that mitigating factors could be considered only as mitigating factors, and the absence of evidence supporting any factor should not be viewed as an aggravating factor].)

California's capital sentencing scheme does not violate the equal protection clause of the federal Constitution by providing significantly fewer procedural protections for person facing a death sentence than one charged with a noncapital crime. (*People v. Fayed*, *supra*, 9 Cal.5th at p. 214.) Capital defendants and noncapital defendants " 'are not similarly situated,' " and it is therefore "permissible for noncapital defendants to have more procedural protections than capital defendants." (*People v. Capers*, *supra*, 7 Cal.5th at p. 1017.)

Finally, defendant contends that California's "very broad death scheme" violates both international law and the federal

Constitution. We have previously rejected this contention, concluding, " '[T]he imposition of the death penalty under California's law does not violate international law or prevailing norms of decency.' " (*People v. Baker* (2021) 10 Cal.5th 1044, 1114, quoting *People v. Krebs* (2019) 8 Cal.5th 265, 351.)

## DISPOSITION

We affirm the judgment.

**GROBAN, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**JENKINS, J.**
**PETROU, J.** *

---

\* Associate Justice of the Court of Appeal, First Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Parker

_____

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**


_____

**Opinion No.** S113962
**Date Filed:**  May 19, 2022

_____

**Court:**  Superior
**County:**  San Diego
**Judge:**  Michael D. Wellington

_____

**Counsel:**

Kathryn K. Andrews, under appointment by the Supreme Court, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Holly D. Wilkens, Theodore Cropley, Quisteen S. Shum and Kristen Ramirez, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Kathryn K. Andrews
Attorney at Law
3060 El Cerrito Plaza, PMB 356
El Cerrito, CA 94530
(510) 501-3756

Kristen Ramirez
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9067